*1065420672*

**IN THE DISTRICT COURT OF ROGERS COUNTY**
**STATE OF OKLAHOMA**

FILED IN THE DISTRICT COURT
ROGERS COUNTY OKLAHOMA

JUN 02 2026

CATHI EDWARDS, COURT CLERK
DEPUTY

| | | |
|---|---|---|
| STATE OF OKLAHOMA, ex rel. GENTNER DRUMMOND, in his official capacity as ATTORNEY GENERAL OF OKLAHOMA,<br><br>Plaintiff,<br><br>v.<br><br>CENTURY ALUMINUM COMPANY, a Delaware corporation; and ALUMINUM OKLAHOMA, LLC d/b/a OKLAHOMA PRIMARY ALUMINUM, LLC,<br><br>Defendants. | ) | Case No. CV-2026-108 |

**PETITION FOR INJUNCTIVE RELIEF AND ABATEMENT OF ANTICIPATORY PUBLIC NUISANCE**

The State of Oklahoma, by and through Attorney General Gentner Drummond, brings this action to protect the air, the water, the land, and the people of Oklahoma from a sprawling heavy-industrial smelting complex that two private ventures—one of them owned outright by the government of an Islamic foreign monarchy—propose to erect in the middle of an Oklahoma community. For its Petition, the State alleges and states as follows:

**NATURE OF THE ACTION**

1. This is an action in the name of the State of Oklahoma to abate and enjoin an anticipated public nuisance, and for related equitable relief, arising from Defendants' planned construction and operation of a primary aluminum smelter at the Tulsa Port of Inola in Rogers County, Oklahoma.

2. Defendants intend to build the largest primary aluminum smelter in the history of the United States—a facility designed to disgorge more than 750,000 metric tons of aluminum each year, and with it the fluoride emissions, particulate matter, perfluorocarbons, spent potliner, and process



EXHIBIT 2

wastewater that the world's aluminum smelters are notorious for producing. They propose to do so a stone's throw from the homes, schools, churches, and farms of Inola, Oklahoma.

3. The State does not bring this action to litigate any question of federal law, and it pleads none. The State asserts only claims arising under the common law and statutes of Oklahoma, and it invokes only the equitable and police powers that the people of this State have vested in their Attorney General.

## PARTIES

4. Plaintiff is the State of Oklahoma, appearing by and through Gentner Drummond in his official capacity as Attorney General of the State of Oklahoma. The Attorney General is the chief law officer of the State and is authorized to bring this action to protect the public health, safety, and welfare and to abate public nuisances affecting the people of the State.

5. Defendant Century Aluminum Company ("Century") is, on information and belief, a Delaware corporation headquartered in Chicago, Illinois, that holds a forty percent (40%) interest in the venture organized to develop, construct, and operate the Inola smelter. Century operates or has operated primary aluminum smelters in Kentucky, South Carolina, and Iceland.

6. Defendant Aluminum Oklahoma, LLC d/b/a Oklahoma Primary Aluminum, LLC is, on information and belief, the operating entity organized to develop, construct, and operate the Inola smelter, and is the entity that has applied to the Oklahoma Department of Environmental Quality for an air-quality permit for the project. A sixty percent (60%) controlling interest in the venture is held by Emirates Global Aluminium ("EGA").

7. EGA is not a private company in any ordinary sense. It is a state-owned enterprise of the United Arab Emirates, owned in equal halves by Mubadala Investment Company—a sovereign wealth fund of the Emirate of Abu Dhabi—and the Investment Corporation of Dubai—a sovereign wealth fund of the Emirate of Dubai. EGA is, in substance and in law, an arm of two foreign

governments. Its sixty percent stake means that the controlling hand behind the largest smelter ever proposed on American soil belongs not to Oklahomans, nor even to Americans, but to a foreign sovereign more than seven thousand miles away.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over this action pursuant to Article VII, Section 7 of the Oklahoma Constitution and 12 O.S. § 2004 and related provisions, the State's claims arising exclusively under the common law and statutes of Oklahoma.

9. Venue is proper in Rogers County under 12 O.S. § 131 et seq. because the real property that is the subject of this action, and the situs of the threatened nuisance, are located in Rogers County, Oklahoma.

10. This controversy belongs in this Court and nowhere else. The State of Oklahoma is not a "citizen" of any State for purposes of diversity jurisdiction under 28 U.S.C. § 1332. See *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973). No diversity of citizenship therefore exists, and none can be manufactured. The State further pleads no claim arising under the Constitution, laws, or treaties of the United States, and expressly disclaims any such claim, so that no federal question appears on the face of this well-pleaded Petition. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).

## FACTUAL ALLEGATIONS

11. On January 26, 2026, Century and EGA announced a joint venture to construct a primary aluminum smelter at the Tulsa Port of Inola, within the city limits of Inola, in Rogers County, Oklahoma. The project has been branded "Oklahoma Primary Aluminum."

12. The venture is propelled by an extraordinary infusion of public money. In 2025, the United States Department of Energy selected Century to receive a grant of up to $500 million to underwrite construction of the smelter. The State of Oklahoma has layered its own subsidies on top, including an incentive package reported to approach $255 million, together with tax credits and

property-tax exemptions, and the City of Inola has created a tax-increment-financing district to support the project.

13. The arrangement was not the product of ordinary market forces. On information and belief, EGA's investment was solicited and secured as part of a government-to-government "strategic partnership" between the United Arab Emirates and the United States announced in Abu Dhabi on or about May 15, 2025. The foreign sovereign's entry into Rogers County was, in short, a matter of state—the business of governments, transacted over the heads of the Oklahomans who will breathe the air.

14. Once built, the facility is designed to be the largest primary aluminum production plant ever constructed in the United States, with a planned capacity exceeding 750,000 metric tons of aluminum per year—enough, by Defendants' own account, to more than double the entire Nation's primary aluminum output. A facility of that scale is an industrial behemoth, and behemoths do not tread lightly.

15. Primary aluminum smelting is among the most polluting heavy-industrial activities known. The electrolytic reduction of alumina releases gaseous and particulate fluorides, sulfur dioxide, fine particulate matter, polycyclic aromatic hydrocarbons, and potent greenhouse gases including perfluorocarbons. The process generates spent potliner, a waste stream that has historically been managed as hazardous. And a smelter of this size consumes electricity and water on a scale that rivals a small city.

16. These are imminent concerns. They are the predictable, well-documented, and intended consequences of operating a primary aluminum smelter, and Defendants know it.

17. The chosen site makes the danger acute. The smelter would occupy roughly 350 acres along the Verdigris River, within approximately three miles of Inola's schools, homes, and farms. A primary aluminum smelter does not belong in a community's backyard, and its emissions do not

respect property lines: on information and belief, prevailing winds would carry the plant's pollutants across Rogers County and into the surrounding communities of northeastern Oklahoma.

18. The facility is projected to draw more than 1,000 megawatts of continuous electricity—more power than many Oklahoma cities consume—placing extraordinary strain on the regional grid served by Public Service Company of Oklahoma and threatening the reliability and affordability of electricity for Oklahoma ratepayers who never agreed to subsidize a foreign sovereign's smelter.

19. According to the project's pending air-quality permit application, the smelter would be authorized to emit on the order of 425 tons of hydrogen fluoride per year—well over a ton every day—of a substance the United States Environmental Protection Agency classifies as extremely hazardous, together with substantial quantities of nitrogen oxides, sulfur dioxide, fine particulate matter laden with heavy metals, and other hazardous air pollutants.

20. Fluoride is the particular menace that an aluminum smelter visits upon an agricultural community. Airborne fluoride settles on forage, hay, and pasture. Cattle, which consume forty to fifty pounds of forage each day, ingest that fluoride and accumulate it irreversibly in their bones and teeth. The overwhelming majority of a grazing animal's fluoride exposure is dietary, which means that a smelter's emissions become the herd's daily diet.

21. The result is fluorosis. Dental fluorosis mottles and prematurely wears an animal's teeth, robbing it of the ability to feed. Skeletal fluorosis brings lameness, painful bone lesions and deformities, stunted growth, diminished milk production, and reproductive failure. For a cattle operation, chronic fluoride exposure is a slow sentence of ruin—for the herd and for the livelihood that depends on it.

22. History records the devastation of entire cattle herds downwind of aluminum smelters, including the well-documented collapse of herds near Cornwall Island attributed to a smelter emitting

less fluoride than the Inola facility would be permitted to release. Inola is hay country and cattle country; the project would convert the heart of an Oklahoma agricultural community into a fluoride emitter of the very kind that has destroyed herds elsewhere.

23. The State of Oklahoma has its own sovereign and proprietary interest at stake. Agriculture is the backbone of Oklahoma's economy and identity, and cattle ranching is its single largest agricultural sector—Oklahoma is consistently among the top cattle-producing States in the Nation, and Rogers County and the surrounding region lie at the heart of that industry. A primary aluminum smelter that poisons the forage and herds of northeastern Oklahoma does not merely injure individual ranchers; it strikes at the State's vital interest in preserving a viable, healthy livestock industry, in protecting the Oklahomans whose livelihoods depend on it, and in safeguarding the agricultural economy that the people of this State have entrusted their Attorney General to defend. The State brings this action to vindicate that interest.

24. The grim reality of industrial fluorosis in cattle is documented in peer-reviewed scientific literature. The images below, drawn from a published review of industrial fluorosis in bovines living near aluminum and other fluoride-emitting plants, depict the dental and skeletal devastation that chronic smelter-fluoride exposure inflicts on cattle—the very harm the Inola smelter threatens to visit upon the herds of Rogers County.



**Figure 1.** Severe dental fluorosis in bovine calves and mature cattle—deep brownish staining, excessive abrasion, and loss of teeth and supporting bone, leaving animals unable to feed.





**Figure 2.** (a, b) Severe skeletal fluorosis in cattle—lameness, enlarged joints, debility, severe wasting of body muscles, and bony lesions in the ribs and limbs.

Source: Choubisa SL, "A brief review of industrial fluorosis in domesticated bovines in India: Focus on its socio-economic impacts on livestock farmers," J. Biomed. Res. 2023;4(1):8-15, doi:10.46439/biomedres.4.028. Reproduced under the Creative Commons Attribution (CC BY) License.

25. Tellingly, this is not how the foreign sovereign behind the venture builds smelters in its own country. In the United Arab Emirates, EGA operates its smelters within dedicated heavy-industrial zones, set apart from homes and farmland: its Al Taweelah smelter anchors the Khalifa Industrial Zone Abu Dhabi, and its Jebel Ali smelter sits within Dubai's industrial port zone. What EGA confines to industrial clusters at home, it proposes to plant in the midst of Oklahoma's schoolchildren, families, and cattle here.

26. Defendant Century's own track record removes any doubt about what Rogers County can expect. In 2023, residents living near Century's primary aluminum smelter in South Carolina sued the company, alleging that the plant had released escalating quantities of pollutants and that, in September 2023, its emissions-control system malfunctioned repeatedly—blanketing surrounding

neighborhoods in "substantial quantities" of chemical dust and leaving residents with headaches, bloody noses, and other ailments.

27. Century denied wrongdoing but, in 2025, paid more than $940,000 to settle the claims of 719 nearby property owners. Separately, South Carolina environmental regulators fined Century more than $360,000 for violating air-pollution limits over a period of years and for failing to file required inspection reports.

28. Century's Kentucky smelter has fared no better. Over roughly the last twelve years, that facility amassed approximately thirty violations—for exceeding emissions limits, for improperly managing hazardous waste, for testing and monitoring failures, for deficiencies in its emergency planning, and for water-quality violations—several of which resulted in civil penalties.

29. Century's answer to this record is a brochure. The company assures the public that the Inola smelter will use newer technology, that lessons have been learned, and that early-detection systems will prevent a repeat. But a corporation that has spent the last twelve years paying fines and settlements for poisoning its neighbors does not get to extinguish a community's well-founded fear with a press release and a promise.

30. Compounding the danger is the question of accountability. The controlling owner of this venture is a foreign sovereign instrumentality whose assets and decision-makers sit abroad, beyond the easy reach of Oklahoma's courts, Oklahoma's regulators, and Oklahoma's citizens. When the fumes settle over Inola, the people harmed will be Oklahomans; the entity that profits, and that holds the controlling vote on how the plant is run, answers to Abu Dhabi and Dubai. The State brings this action precisely because the ordinary checks that restrain a local nuisance-maker are weakest where the controlling interest is a foreign government.

31. The threat is imminent. The venture has already applied to the Oklahoma Department of Environmental Quality for an air-quality permit for the construction phase of the project.

Defendants have engaged engineering and construction contractors, secured hundreds of millions of dollars in public funding, and publicly represented that construction is expected to begin this year.

32. On information and belief, Defendants intend to route the smelter's industrial process wastewater through an existing wastewater-treatment facility that was neither designed nor permitted to treat the volume or character of waste a primary aluminum smelter generates.

33. The harm Defendants threaten is the kind that cannot be undone with money once it arrives. Air once fouled cannot be recalled; groundwater once contaminated cannot be wrung clean; pasture once laden with fluoride cannot be made safe for the herds that graze it; a cattle operation once destroyed, and the livestock industry it feeds, cannot be conjured back; and a child's lungs once injured cannot be made whole by a damages award. The injury is imminent, it is grave, and it is irreparable.

**COUNT I — ANTICIPATORY PUBLIC NUISANCE (50 O.S. §§ 1, 8)**

34. The State re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

35. Under Oklahoma law, a nuisance consists of unlawfully doing an act, or omitting to perform a duty, that annoys, injures, or endangers the comfort, repose, health, or safety of others, or that renders other persons insecure in life or in the use of property. 50 O.S. § 1. A public nuisance is one that affects an entire community or neighborhood, or any considerable number of persons. 50 O.S. § 2.

36. Equity will intervene to enjoin a nuisance before it comes into being where, as here, the proposed use is one that will be a nuisance in fact and the resulting injury is practically certain, imminent, and irreparable. Oklahoma recognizes the anticipatory abatement of a threatened nuisance in such circumstances.

37. A primary aluminum smelter of unprecedented size, to be operated by a company with a documented, multi-state history of emissions violations and harm to its neighbors, sited within approximately three miles of an Oklahoma town, is a nuisance in the making. Its operation as planned will injure the health, comfort, repose, and safety of the people of Inola and Rogers County; will poison the forage on which their cattle depend and the herds those cattle sustain; and will render the community insecure in the use and enjoyment of their property, their pasture, and their livelihoods.

38. Because the threatened injury is practically certain, imminent, and irreparable, and because money damages cannot compensate the community for fouled air, contaminated water, and impaired health, the State is entitled to an order enjoining and abating the threatened nuisance.

## COUNT II — THREATENED POLLUTION UNDER THE OKLAHOMA ENVIRONMENTAL QUALITY CODE (27A O.S. § 2-6-105) (PLEADED IN THE ALTERNATIVE)

39. The State re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

40. The Oklahoma Environmental Quality Code makes it unlawful to cause pollution of the waters of the State or to place or cause to be placed any wastes in a location where they are likely to cause pollution of the air, land, or waters of the State. 27A O.S. § 2-6-105.

41. Defendants' planned construction and operation of the Inola smelter, including their plan to route industrial process wastewater through a treatment facility not designed or permitted for such waste, is likely to cause pollution of the air, land, and waters of the State within the meaning of the Code.

42. The State is entitled to equitable relief restraining Defendants from proceeding in a manner that is likely to result in unlawful pollution of the air, land, and waters of the State.

## PRAYER FOR RELIEF

WHEREFORE, the State of Oklahoma respectfully prays that this Court:

A. Enter a temporary, preliminary, and permanent injunction restraining Defendants, and all persons acting in concert with them, from constructing or operating the Inola primary aluminum smelter except upon such terms and conditions as are necessary to prevent the threatened public nuisance and threatened pollution alleged herein;

B. Order the abatement of the anticipated public nuisance; and

C. Grant such other and further relief as the Court deems just and equitable.

Respectfully submitted,

GENTNER DRUMMOND, OBA #16645
*Attorney General*
GARRY M. GASKINS, II, OBA #20212
*Solicitor General*
JENNIFER L. LEWIS, OBA #32819
*Deputy Attorney General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921