**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, ex rel. | ) | |
| GENTNER DRUMMOND, in his official | ) | |
| capacity as ATTORNEY GENERAL OF | ) | |
| OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 26-cv-00450-SEH-SH |
| | ) | |
| v. | ) | |
| | ) | |
| CENTURY ALUMINUM COMPANY, a | ) | |
| Delaware corporation; and ALUMINUM | ) | |
| OKLAHOMA, LLC d/b/a OKLAHOMA | ) | |
| PRIMARY ALUMINUM, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## AND BRIEF IN SUPPORT

# TABLE OF CONTENTS

*Page*

STATEMENT REGARDING JURISDICTION ...........................................................................1

INTRODUCTION ....................................................................................................................2

BACKGROUND .......................................................................................................................5

    A.   The Project: The Largest Smelter in American History, Three Miles from Inola, the Hay Capital of the World. ....................................................................................................5

    B.   Procedural History. ..................................................................................................10

    C.   The Moratorium Expires August 28—and Defendants Say Site Work Begins This Year. .........................................................................................................................11

LEGAL STANDARD ...............................................................................................................12

ARGUMENTS AND AUTHORITIES .....................................................................................13

    I.   The State Is Likely to Succeed on the Merits. .....................................................13

        A.   The Smelter Is an Anticipatory Public Nuisance Under Oklahoma Law. ................13

        B.   Neither a Pending DEQ Permit Nor OKLA. STAT. tit. 50, § 4 Shields the Project. 16

        C.   In the Alternative, the State Is Likely to Succeed Under the Oklahoma Environmental Quality Code. ..................................................................................19

    II.   The Threatened Harm Is Irreparable: Fluoride Cannot Be Recalled from Bone, Pasture, or Water. ........................................................................................................20

    III.   The Balance of Equities Tips Decidedly in the State's Favor. ..........................22

    IV.   A Preliminary Injunction Serves the Public Interest. .........................................23

    V.   No Security Should Be Required. ...........................................................................24

CONCLUSION .......................................................................................................................25

**TABLE OF AUTHORITIES**

*Page(s)*

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987)........................................................20

*B.H. v. Gold Fields Mining Corp.*, 506 F. Supp. 2d 792 (N.D. Okla. 2007) ....................................17, 18

*Baker v. Ellis*, 1956 OK 26, 292 P.2d 1037........................................................14

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238 (10th Cir. 2022) 10

*Briscoe v. Harper Oil Co.*, 1985 OK 43, 702 P.2d 33 ........................................................17, 19

*Cherokee Nation v. McKesson Corp.*, 529 F. Supp. 3d 1225 (E.D. Okla. 2021)....................................14

*Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780 (10th Cir. 1964) ........................................................24

*Díné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016) ..............................12

*DuLaney v. Okla. State Dep't of Health*, 1993 OK 113, 868 P.2d 676 ........................................................15

*E.I. Du Pont de Nemours Powder Co. v. Dodson*, 1915 OK 256, 150 P. 1085 ....................................17, 18

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019) ..............................13

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005)....................................10

*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250 (10th Cir. 2003) ........................................................20

*Heideman v. S. Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) ........................................................20

*House of Realty, Inc. v. City of Midwest City*, 2004 OK 97, 109 P.3d 314........................................................14

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)................................2

*Laubenstein v. BoDe Tower, L.L.C.*, 2016 OK 118, 392 P.3d 706........................................................18

*McDaniel v. Century Aluminum Co.*, No. 2:23-cv-5766-RMG (D.S.C. July 23, 2025) ............. 9, 16, 20

*McPherson v. First Presbyterian Church of Woodward*, 1926 OK 214, 248 P. 561 ..............................14, 19

*Nichols v. Mid-Cont. Pipe Line Co.*, 1996 OK 118, 933 P.2d 272........................................................18

*Reynolds Metals Co. v. Yturbide*, 258 F.2d 321 (9th Cir. 1958) ........................................................ 3, 9, 20

*Schrier v. Univ. of Colo.*, 427 F.3d 1253 (10th Cir. 2005)........................................................13

*Sharp v. 251st St. Landfill, Inc. (Sharp I)*, 1991 OK 41, 810 P.2d 1270
........................................................ 15, 17, 19

*Sharp v. 251st St. Landfill, Inc. (Sharp II)*, 1996 OK 109, 925 P.2d 546
........................................................14, 15, 19, 20

*State ex rel. Drummond v. Tyson Foods, Inc.*, 653 F. Supp. 3d 937 (N.D. Okla. 2023) ........................18

*Town of Rush Springs v. Bentley*, 1919 OK 203, 182 P. 664 ........................................................14, 19

*Union Oil Co. of Cal. v. Heinsohn*, 43 F.3d 500 (10th Cir. 1994) ........................................................16

*United States v. Cotton*, 535 U.S. 625 (2002) ........................................................1

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) ..............................................................12

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................................................12

**Statutes**

15 U.S.C. § 78m..............................................................................................................3, 21

28 U.S.C. § 1447 .................................................................................................................2

42 U.S.C. § 7401 ...............................................................................................................23

Iran Threat Reduction and Syria Human Rights Act of 2012, § 219 ................................3

OKLA. STAT. tit. 12, § 1397..........................................................................................13, 24

OKLA. STAT. tit. 27A, § 2-3-504 ......................................................................................13

OKLA. STAT. tit. 27A, § 2-5-105 ......................................................................................18

OKLA. STAT. tit. 27A, § 2-6-105 .................................................................................14, 19

OKLA. STAT. tit. 50, § 1 ....................................................................................................13

OKLA. STAT. tit. 50, § 2 ....................................................................................................13

OKLA. STAT. tit. 50, § 4 ........................................................................................ 16, 17, 18

OKLA. STAT. tit. 50, § 8 ....................................................................................................13

OKLA. STAT. tit. 74, § 18b................................................................................................13

Reindustrialize Oklahoma Act of 2025, H.B. 2781 (Okla. 2025) ........................ 18, 22, 24

**Rules**

Fed. R. Civ. P. 65.......................................................................................................... 1, 24, 25

LCvR 7-1 ...........................................................................................................................11

**Other Authorities**

Okla. Att'y Gen. Op. No. 97-30 (May 5, 1997) ................................................................17

The State of Oklahoma respectfully moves the Court, pursuant to Federal Rule of Civil Procedure 65(a), for a preliminary injunction restraining Defendants, and all persons acting in concert with them, from commencing or continuing construction of the proposed Inola primary aluminum smelter—including site preparation, grading, and foundation work—pending final judgment. The State files this motion expressly subject to, and without waiver of, its pending Motion to Remand (Doc. 11). In support, the State submits the following brief.

### STATEMENT REGARDING JURISDICTION

The State does not concede, and expressly contests, this Court's subject-matter jurisdiction. The State's Motion to Remand, filed July 23, 2026, remains pending, and the State stands on it in full. Doc. 11. The State files this motion protectively because the calendar will not wait for the jurisdictional question: the moratorium that currently bars construction expires on or about August 28, 2026, and Defendants have "publicly represented that construction is expected to begin this year." Pet. ¶ 31.[1] Whichever court ultimately adjudicates this case must be in a position to act before ground is broken.

Nothing about this filing waives the State's jurisdictional objections. Subject-matter jurisdiction "can never be forfeited or waived," *United States v. Cotton*, 535 U.S. 625, 630 (2002),

---

[1] Ex. 1, Memorandum of Understanding between Emirates Global Aluminum and Governor J. Kevin Stitt ("MOU"), at 8 ("[t]he expectation is for preparatory site works (in advance of the construction of the Smelter) to commence in 2026."), https://www.okcommerce.gov/wp-content/uploads/Emirates-Global-Aluminium-MOU.pdf (although the MOU is marked confidential, it was published on a publicly available website, so the confidentiality was waived prior to the filing of this motion); Ex. 2, Oklahoma Primary Aluminum Answers Center, *Where are you in the planning and development process right now?* ("We are conducting environmental surveys and studies as part of the permitting process and expect to begin early site prep by the end of 2026."); Ex. 3, Oklahoma Primary Aluminum Answers Center, *What is the anticipated timeline for bringing the project to life?* (indicating site work is anticipated to begin by end of 2026). *See also* Ex. 4, Graycen Wheeler, *Inola Hits Pause on Smelter After Weighing Resident Pushback, Trump Support*, KOSU (reporting the moratorium's adoption and sixty-day term).

and no party's litigation conduct can confer it, *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Section 1447(c) commands remand "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). The State respectfully submits that the Court should resolve the Motion to Remand first. If the Court remands, this motion should travel with the case to the District Court of Rogers County, where the State will stand on the same papers. If the Court instead concludes that it has jurisdiction, it should grant this motion for the reasons that follow.

### INTRODUCTION

This motion asks the Court to do one thing: keep the ground at Inola unbroken, as the Town of Inola's moratorium keeps it today, until the lawfulness of Defendants' smelter can be adjudicated on the merits. On June 29, 2026, the Town of Inola adopted a sixty-day moratorium on new construction in the zoning district containing the smelter site. Ex. 4. That moratorium expires on or about August 28, 2026. When it lapses, nothing will stand between Defendants and groundbreaking except a court order. Under the Local Rules, Defendants' response to this motion will not even come due until after that date.

The merits have not changed since the State filed its Petition. Defendants propose to build the largest primary aluminum smelter in American history within approximately three miles of Inola's homes, schools, and pastures. Pet. ¶¶ 2, 14, 17. By Defendants' own permit application, the facility will emit on the order of 425 tons of fluoride compounds per year. Pet. ¶ 19; Ex. 5, PSD Application to Construct, Oklahoma Aluminum: New Primary Aluminum Smelter, dated Feb. 9, 2026, Table 2: Other Pollutants Facility-Wide [Potential to Emit], at 7–8 (indicating total fluoride potential emissions of 425.5 tons per year); App'x B Emissions Calculations at the second page of the calculation tables (showing calculations for total fluoride emissions of 425.5 tons per

year). Airborne fluoride settles on forage.[2] When cattle eat the contaminated forage, the fluoride accumulates irreversibly in their bones and teeth. Ex. 6. The resulting disease, fluorosis, has destroyed herds downwind of aluminum smelters before. Pet. ¶¶ 20–22.[3] These are the documented results of operating a primary aluminum smelter at the emission levels Defendants themselves project. Pet. ¶ 16.

Moreover, recent developments underscore the need for transparency and further inquiry before ground is broken. Aluminum Oklahoma LLC, also referred to as Oklahoma Primary Aluminum, was formed as a foreign limited liability company on November 14, 2025, with Century Aluminum and Emirates Global Aluminum as co-owners.[4] On March 3, 2026, Century filed with the United States Securities and Exchange Commission a Notice of Disclosure under Section 219 of the Iran Threat Reduction and Syria Human Rights Act of 2012 and Exchange Act Section 13(r) (the "Iran Threat Disclosure"). The Iran Threat Disclosure was filed along with

---

[2] Ex. 6, Scott Fritz, *Fluoride Poisoning in Animals*, Merck Veterinary Manual, https://www.merckvetmanual.com/toxicology/fluoride-poisoning/fluoride-poisoning-in-animals (last updated Mar. 2026) ("Fluoride dusts dispersed downwind from manufacturing facilities can contaminate forage crops for miles."); Ex. 7, Max M. Gillings et al., *Spatial Extent and Age-Related Bioaccumulation of Fluoride in the Bones of House Sparrows Around Aluminum Smelting Operations*, Environmental Research, at 1 (Nov. 15, 2025), https://www.sciencedirect.com/science/article/pii/S0013935125015658 ("Due to its low molecular weight, particulate emissions of fluoride can remain suspended in the atmosphere for extended periods, enhancing its potential for long-range transport").

[3] *Reynolds Metals Co. v. Yturbide*, 258 F.2d 321, 324 (9th Cir. 1958) (noting it did "not appear to have been controverted that cattle damage from an aluminum plant is a fairly common phenomenon."); Ex. 8, Lennart Krook & George A. Maylin, *Industrial Fluoride Pollution: Chronic Fluoride Poisoning in Cornwall Island Cattle*, 69 Cornell Veterinarian 1 (Supp. 8, Apr. 1979), https://babel.hathitrust.org/cgi/pt?id=uc1.b4179405&seq=457&q1=cornwall.

[4] Ex. 9, *Oklahoma's Burgeoning Aluminum Hub Gets Boost with Agreement Between U.S. Aluminum Company and EGA. Century Aluminum*, Okla. Dep't of Commerce (Feb. 24, 2026), https://www.okcommerce.gov/aluminum-hub-gets-boost-with-agreement-between-us-aluminum-company-ega-century-aluminum/; Ex. 10, Oklahoma Secretary of State Business Entity Corporate Information for Aluminum Oklahoma LLC.

Century's Annual Report for FY 2025, admitting that Century's largest stockholder has agricultural sales contracts with the Islamic Republic of Iran.[5] The other owner, Emirates Global Aluminum, is owned by Mubadala Investment Company of Abu Dhabi and Investment Corporation of Dubai.[6] Mubadala is a sovereign wealth fund in the United Arab Emirates ("UAE") that manages investments for its shareholder, the Government of Abu Dhabi, and has substantial partnerships with China.[7]

As the United States stood on the precipice of armed conflict with the Islamic Republic of Iran, Century was disclosing to the SEC, as it was federally required to do, that its largest shareholder—also its largest customer—had active contracts to sell agricultural products to entities owned by the Government of Iran. Yet Defendants never disclosed this information to Oklahomans, even as they asked Oklahoma's agricultural heartland to absorb the risks of their project. These matters may not ultimately decide the merits of the State's claims in this case. However, they raise additional concerns and reasons supporting the injunction—preserving the

---

[5] Ex. 11, Iran Threat Disclosure (Mar. 3, 2026), *IRANNOTICE*, https://investors.centuryaluminum.com/financials/sec-filings/default.aspx; *see also* Ex. 12, Form 10-K, Century Aluminum Company Annual Report for Fiscal Year Ended December 31, 2025, at 115 ("The Company [Century] hereby discloses the following information provided by our largest stockholder regarding transactions or dealings with entities controlled by the Government of Iran (the 'GOI'): During the year ended December 31, 2025, non-U.S. affiliates of the largest stockholder of the Company ('the non-U.S. Stockholder Affiliates') entered into sales contracts for agricultural products with, or for delivery to or from Iranian entities wholly or majority owned by the GOI . . . .").

[6] EGA, About Us, https://www.ega.ae/en/about-us (last accessed Aug. 10, 2026).

[7] Ex. 13, Mubadala Portfolio, https://www.mubadala.com/en/what-we-do/uae-china-joint-investment-fund; Mubadala, About Mubadala, https://www.mubadala.com/en/who-we-are/about-mubadala (last accessed Aug. 10, 2026) (describing Mubadala as a sovereign investor generating returns for its shareholder, the Government of Abu Dhabi); Ex. 14, Press Release of the U.S. House Select Committee on the Chinese Communist Party (investigating a UAE company in which Mubadala is a key investor), https://chinaselectcommittee.house.gov/media/press-releases/gallagher-calls-usg-investigate-ai-firm-g42-ties-prc-military-intelligence.

status quo and allowing further inquiry into matters bearing on the public interest and the equitable analysis. At a minimum, Oklahomans are entitled to fully vet the project, including the environmental impacts as well as ownership and governance ties.

Oklahoma law does not require the State to wait until the stacks are built and the forage and other natural resources are contaminated. For a century, Oklahoma courts have enjoined threatened nuisances, including permitted facilities not yet built, upon clear and convincing evidence of a reasonable probability of irreparable injury. The State can make that showing on Defendants' own numbers. And the balance of harms is not close: Defendants would lose time on a project whose lawfulness has never been adjudicated, while the people of Rogers County stand to lose their health, their herds, and their livelihoods, none of which a damages award can restore. The Court should enjoin commencement of construction pending final judgment.

## BACKGROUND

**A.      The Project: The Largest Smelter in American History, Three Miles from Inola, the Hay Capital of the World.**

The Petition's allegations are detailed at Pet. ¶¶ 11–33 and supported by the declarations and exhibits filed with this motion. In brief: Defendants intend to construct and operate, at the Tulsa Port of Inola in Rogers County, a primary aluminum smelter with a planned capacity of 750,000 metric tons per year of liquid aluminum, which by Defendants' own account is enough to more than double the Nation's entire primary aluminum output. Pet. ¶ 14.[8] The smelter would

---

[8]      Ex. 5, PSD Appl., at 2; Ex. 15, Oklahoma Primary Aluminum Answers Center, What is the vision and purpose of this project? (indicating a doubling of domestic aluminum output). The Application was submitted by Environmental Resources Management on behalf of EGA— majority owner of Defendants' joint venture—for the smelter Defendants will construct and operate; its figures and assumptions describe Defendants' project. Ex. 5, PSD Application cover letter (Feb. 9, 2026).

occupy a parcel of land of approximately 633 acres along the Verdigris River, within approximately three miles of Inola's schools, homes, and farms.[9] The air-quality permit application projects emissions on the order of 425 tons of fluoride compounds per year, more than a ton every day, together with substantial quantities of nitrogen oxides, sulfur dioxide, and fine particulate matter. Pet. ¶ 19.[10]

Those figures come from Defendants' own application, and the agency reviewing that application has found it deficient. On July 2, 2026, the Oklahoma Department of Environmental Quality ("DEQ") suspended its technical review, placed the application in "Pending Facility Action" status, and directed Defendants to correct and supplement the application's core components: its best-available-control-technology analysis, its emission calculations, and its air-dispersion modeling. Ex. 16, DEQ Pending Facility Action Letter, at 1–2 (July 2, 2026) (with Attachments 1–2). Among the problems DEQ identified, Defendants' own emission calculations show total fluoride emissions from the potrooms of 1.514 pounds per ton of aluminum, roughly fifty percent above the 1.02-pound-per-ton limit Defendants propose as adequate. *Id.* at Attach. 2, Section 3.3.1(2). DEQ further observed that comparable European smelters, including a facility

---

[9]    *See* Ex. 1, MOU, at 10–11 ("A potential suitable site for the Smelter is a parcel of land situated within The City of Inola in Rogers County, Oklahoma which is roughly six hundred thirty-three (633) acres in size.").

[10]    Ex. 5, PSD Appl., at 7, Table 1 Criteria Pollutant Facility-Wide [Potential to Emit]; *id.* at 7–8, Table 2: Other Pollutants Facility-Wide [Potential to Emit]; *id.* at App'x B Emissions Calculations at the second page of the calculation tables.

Defendant Century itself operates in Iceland,[11] hold permits with fluoride limits below what Defendants propose for Inola, and that two operated by other companies are limited to roughly half that figure. *Id.* at Attach. 1, Section 3.3.1(16). The State's engineering expert independently explains why the Al Taweelah smelter summary on which the Application leans cannot carry the estimate: it offers no underlying test reports, no potline operating parameters, and no variability data. Ex. 35, Decl. of Dr. Ranajit (Ron) Sahu ("Sahu Decl.") ¶ 17. Defendants' total fluoride assessment is not due to DEQ until September 26, 2026, and DEQ's 365-day review deadline is tolled until Defendants respond. Ex. 16 at 2.

Fluoride from aluminum smelters poses a substantial threat to cattle herds.[12] Airborne fluoride settles on forage, hay, and pasture; grazing cattle consume forty to fifty pounds of forage each day (twenty-six pounds measured as dry matter for a mature cow with calf); and ingested fluoride accumulates irreversibly in bone and teeth. Pet. ¶ 20.[13] The result is fluorosis: dental erosion that leaves an animal unable to feed, and skeletal disease that brings lameness, stunted growth, diminished milk production, and reproductive failure. Pet. ¶ 21.[14]

---

[11] In recent earnings calls, Century Aluminum indicated it has had substantial equipment failures at its Iceland facility that shut down a substantial share of production, with repairs expected to take 11–12 months. *See* Ex. 17, Century Aluminum Company Earnings Call Q2 2026, at 15–17 (Aug. 6, 2026) (indicating significant expenditures for equipment failure); Ex. 18, Century Aluminum Presentation Accompanying Q3 2025 Earnings Call, at 2, 8–9 (Nov. 6, 2025) (indicating repairs at the Iceland smelter are expected to take 11–12 months).

[12] *See* Ex. 8 at 7 ("'Of all pollutants which affect farm animals, fluorine has caused the most severe and widespread damage' … Cattle are especially susceptible." (citation omitted)); Ex. 7 at 1 ("Aluminum smelting is a leading source of atmospheric fluoride emissions.").

[13] Ex. 19, Daren D. Redfearn & Terrence G. Bidwell, *Stocking Rate: The Key to Successful Livestock Production*, Okla. Coop. Extension Serv. PSS-2871, at 1 & tbl. 1 (a 1,000-pound cow with calf consumes 26 pounds of dry forage each day); Ex. 6 at 6 ("No effective treatment exists for chronic fluorosis. Prevention by controlling exposure is critical.").

[14] Ex. 6 at 4 ("Decreased feed and water intake, weight loss, and decreased milk production in lactating animals result from dental lesions that impair mastication … Skeletal lesions result from

The veterinary literature documents the collapse of entire herds downwind of aluminum smelters, most notoriously at Cornwall Island, where a smelter that emitted less fluoride than the Inola facility would release poisoned the local cattle population. Pet. ¶ 22; *see* Ex. 8 at 14, 63 ("Chronic fluoride poisoning in Cornwall island cattle was manifested clinically by stunted growth and dental fluorosis to a degree of severe interference with drinking and mastication.").

Rogers County sits at the heart of the largest sector of Oklahoma's agricultural economy.[15] This motion focuses on the threats that the proposed aluminum smelter poses to agriculture in Rogers County. In particular, this motion highlights the threats from fluoride emissions. However, there are also numerous other threats to Oklahoma public health and natural resources from other air emissions of the smelter, such as volatile organic compounds, particulate matter, carbon monoxide, sulfur dioxide, nitrogen dioxide, and hazardous air pollutants. Moreover, there are risks from wastewater discharges and solid and hazardous waste disposal. Considering the tight timeframe for filing this motion prior to the expiration of the moratorium, the State draws the Court's attention to problems created by the smelter's anticipated fluoride emissions. The State plans to further describe the numerous threatened nuisances posed by the smelter, including those from fluoride emissions and other contaminants, in future briefing.

---

increased bone resorption and remodeling and cause lameness, stiffness, and reluctance to move.").

[15] Ex. 20, Okla. Pork Council, *Oklahoma Pork's Economic Impact* (indicating that production of cattle ranks first as Oklahoma's largest agricultural enterprise, followed by swine and broiler production); Ex. 21, Okla. Beef Council, *Oklahoma Beef Facts* (reporting that Oklahoma ranks second among the states in beef cattle production); Ex. 22, U.S. Dep't of Agric., 2022 Census Vol. 1, Ch. 2: County Level Data, Table 1. County Summary Highlights: 2022, Rogers County, at 245 (reporting, as of the time of the 2022 Census, Rogers County had 1,653 farms, covering a total of 269,973 acres, and a total of 68,419 cattle and calves inventory).

One example beyond agriculture suffices for now: emissions of this kind have harmed people as well as livestock. In *Reynolds Metals Co. v. Yturbide*, 258 F.2d 321, 323 (9th Cir. 1958), a husband, wife, and daughter lived on a cattle farm about a mile to a mile and a half from an aluminum plant. Fluoride emissions from the plant poisoned all three, producing fluorosis and toxic hepatitis, with symptoms that included digestive illness, severe back and leg pain, a dry cough and shortness of breath on exertion, and extreme urinary frequency. *Id.* at 325–26 & n.6. The Ninth Circuit, sitting en banc, affirmed the family's judgments against the plant's operator, noting it did "not appear to have been controverted that cattle damage from an aluminum plant is a fairly common phenomenon." *Id.* at 324.

Defendants' operating record leaves little doubt about what the people of Rogers County can expect. In September 2023, emissions events at Century's Mount Holly smelter near Goose Creek, South Carolina, coated the surrounding neighborhoods with alumina dust, and in 2025 Century paid $944,000 to resolve the resulting federal class action on behalf of 719 nearby property owners. Pet. ¶¶ 26–27; Ex. 23, Order and Opinion, *McDaniel v. Century Aluminum Co.*, No. 2:23-cv-5766-RMG, Doc. 79, at 1, 3, 7 (D.S.C. July 23, 2025) (approving class action settlement). South Carolina's environmental agency separately fined Century $361,500 for exceeding fluoride and particulate-matter limits over a period of years. Ex. 24, Summary Sheet, Enforcement Action Report, S.C. Dep't of Env't Servs. at Action No. 25 (Apr. 2025). In Kentucky, Century's operations have drawn roughly thirty violations over the past twelve years for exceeding emission limits, mishandling hazardous waste, and related compliance failures. Pet.

9

¶ 28.[16] And Defendants intend to route the smelter's industrial process wastewater through an existing treatment facility that was neither designed nor permitted to treat it. Pet. ¶ 32.[17]

### B. Procedural History.

The State filed its Petition for Injunctive Relief and Abatement of Anticipatory Public Nuisance in Rogers County on June 2, 2026, pleading two claims arising exclusively under Oklahoma law and disclaiming any federal cause of action. Pet. ¶¶ 3, 10, 34–42. Defendants removed on July 21, 2026, on a *Grable*[18] theory the Tenth Circuit rejected in *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1257, 1265–71 (10th Cir. 2022). The State moved to remand on July 23, 2026, and sought its fees and costs for an objectively unreasonable removal. Doc. 11. That motion remains pending, and the State stands on it. On July 28, 2026, Defendants moved to dismiss or to stay this action pending completion of DEQ's permitting review. Doc. 13 at 20. The State will respond to that motion separately. For present purposes, the

---

[16] Ex. 25, Kayla Branch, *One of the companies behind a planned Oklahoma smelter has a history of air pollution violations*, THE FRONTIER (Apr. 9, 2026); Ex. 26, EPA RCRA Inspection Report (Dec. 1–2, 2021) (documenting numerous violations of the Resource Conservation and Recovery Act (RCRA), federal regulations, and Kentucky state regulations at Century Aluminum's smelter located in Robards, Kentucky (Henderson County)); Ex. 27, EPA RCRA Inspection Report (May 2, 2023) (documenting numerous violations of the Resource Conservation and Recovery Act (RCRA), federal regulations, and Kentucky state regulations at Century Aluminum's smelter located at Hawesville, Kentucky (Hancock County)).

[17] Ex. 28, Oklahoma Primary Aluminum Answers Center, *How will groundwater and soil be protected?* ("Industrial wastewater will be processed in accordance with a Tulsa Port of Inola Industrial User Permit before entering the Port's wastewater treatment plant, which itself operates under a separate Oklahoma DEQ discharge permit."); Ex. 29, Oklahoma Primary Aluminum Answers Center, *How will industrial wastewater from the facility be managed and regulated?* ("Industrial wastewater from the facility will be treated under strict pretreatment standards before being discharged to the Tulsa Port of Inola Wastewater Treatment Plant.").

[18] *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).

motion matters for what it concedes: "[c]onstruction has not commenced," and Defendants' air-quality permit application remains pending before DEQ. Doc. 13 at 2.

### C. The Moratorium Expires August 28—and Defendants Say Site Work Begins This Year.

On June 29, 2026, after a lengthy public meeting at which most speakers urged a pause, the Town of Inola adopted a sixty-day moratorium on new construction in its Industrial Heavy District—the zoning district containing the proposed smelter site. Ex. 4. The council had considered a 180-day moratorium, *see* Ex. 30, Town of Inola Agenda for Regular Board of Trustees and Inola Public Works Authority with attached draft Ordinance No. 2026-06, Art. VI(A), but it adopted a sixty-day moratorium instead. Ex. 4. The moratorium therefore expires on or about August 28, 2026.

Under the Local Rules, Defendants' response to this motion will not come due until after the moratorium has expired. *See* LCvR 7-1. By the time briefing closes, Defendants will be free to break ground unless a court orders otherwise. Defendants have engaged engineering and construction contractors, secured hundreds of millions of dollars in public funding, and publicly represented that construction is expected to begin this year. Pet. ¶ 31.[19] The State therefore requests expedited consideration of this motion. The urgency is not of the State's making: the

---

[19] Ex. 31, Emirates Global Aluminum Feb. 10, 2026, Media Announcement, *Bechtel to Lead Preparatory Engineering Work on Oklahoma Aluminum Project*; Ex. 32, Bechtel Feb. 10, 2026, Media Announcement, *Bechtel Selected for Preparatory Engineering on Oklahoma Aluminum Project*; Ex. 1, MOU, at 9–10 (describing "an approved development plan for Tax Increment Financing (TIF) program" with "total TIF funds estimated to be approximately five hundred and forty-five million dollars (USD545,000,000)"); Ex. 33, Oklahoma Primary Aluminum Answers Center, *Is the project, EGA or Century Aluminum directly taking money from Oklahoma taxpayers?* (describing a State-funded LEAD package of $255 million); Ex. 34, U.S. Dep't of Energy, *Energy Department Awardee to Build First American Aluminum Smelter Since 1980* (announcing a $500 million grant from the U.S. Dep't of Energy to Century Aluminum for construction of a primary aluminum smelter in Inola, Oklahoma).

State sought injunctive relief the day it filed in Rogers County, Defendants' removal is what brought the case here, and the State moved to remand within two days and now moves for preliminary relief weeks before the moratorium expires. The deadline that matters was set by Defendants' own announced construction schedule. Alternatively, the State remains willing to enter a stipulation preserving the status quo pending disposition of the Motion to Remand and this motion, which would eliminate any need for an expedited schedule.

A stipulation should cost Defendants nothing if they mean what they have told this Court. Defendants represent that "[c]onstruction has not commenced" and that issuance of the air-quality permit "is a condition to commence construction." Doc. 13 at 2, 7. No permit can issue while DEQ's review remains suspended awaiting Defendants' own submissions, the last of which is not due until September 26, 2026. Ex. 16 at 2. If Defendants stand by their representations, a standstill changes nothing for them. If they refuse one, the refusal will confirm what their public statements already indicate: that Defendants intend to break ground before any permit issues. And site preparation and grading require no air-quality permit at all, which is why the requested injunction expressly reaches them.

## LEGAL STANDARD

A preliminary injunction's purpose "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The movant must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). The injunction the State seeks is prohibitory, not mandatory: it would preserve the last uncontested status between

12

the parties—no construction—exactly as the moratorium preserves it today. Defendants' own filing confirms that status. *See* Doc. 13 at 2 ("Construction has not commenced."). The ordinary standard therefore applies. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–61 (10th Cir. 2005); *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019).

## ARGUMENTS AND AUTHORITIES

### I. The State Is Likely to Succeed on the Merits.

### A. The Smelter Is an Anticipatory Public Nuisance Under Oklahoma Law.

Oklahoma law defines a nuisance in terms that map directly onto Defendants' project:

> A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either: First. **Annoys, injures or endangers the comfort, repose, health, or safety of others**; or . . . Fourth. In any way **renders other persons insecure in life, or in the use of property** . . . .

OKLA. STAT. tit. 50, § 1 (emphases added). A nuisance is public when it "affects at the same time an entire community or neighborhood, or any considerable number of persons." *Id.* § 2. The remedies against a public nuisance include a civil action and abatement, *id.* § 8, and injunctions may issue in the name of the State to suppress nuisances, OKLA. STAT. tit. 12, § 1397.

The Attorney General is authorized to bring this action to protect the public health, safety, and welfare, Pet. ¶ 4; OKLA. STAT. tit. 74, § 18b(A)(3), and he holds express statutory authority to "bring an action in a court of competent jurisdiction for the prosecution of a violation by any person" of the Oklahoma Environmental Quality Code. OKLA. STAT. tit. 27A, § 2-3-504(E). The Code likewise authorizes "[a]ny action for injunctive relief to redress or restrain a violation" of the Code to be brought by "the Attorney General on behalf of the State of Oklahoma," and vests the Court with jurisdiction to grant "mandatory or prohibitive injunctive relief" and "interim equitable relief." *Id.* § 2-3-504(F)(1)(b), (F)(2).

The Code also supplies the unlawfulness the State's nuisance law requires: it makes unlawful the causing of pollution of the waters of the State and the placement of wastes where they are likely to cause pollution of the air, land, or waters of the State. OKLA. STAT. tit. 27A, § 2-6-105(A). And the Code does not leave the classification to inference: "[a]ny such action is hereby declared to be a public nuisance." *Id.* A nuisance claim predicated on the violation of a statute satisfies the State's nuisance law. *Cherokee Nation v. McKesson Corp.*, 529 F. Supp. 3d 1225, 1235 (E.D. Okla. 2021) (allegations of statutory violations "satisfy the requirement that a nuisance claim be based on either an unlawful act or failure to perform a legal duty").

Oklahoma courts have enjoined threatened nuisances for a century. The governing standard comes from *McPherson v. First Presbyterian Church of Woodward*, 1926 OK 214, ¶¶ 18–19, 248 P. 561, 566, which affirmed an injunction against construction of a filling station adjacent to two churches: the threatened injury must be irreparable in damages, and the evidence must be clear and convincing, establishing not a mere possibility or apprehension of harm but a reasonable probability that the injury will occur. *Accord Sharp v. 251st St. Landfill, Inc.* (*Sharp II*), 1996 OK 109, ¶ 5, 925 P.2d 546, 549 ("a mere fear or apprehension of injury" is insufficient; "a reasonable probability" suffices); *House of Realty, Inc. v. City of Midwest City*, 2004 OK 97, ¶ 11, 109 P.3d 314, 317–18 (quoting *Sharp II*'s reasonable-probability standard). A plaintiff confronted with a threatened nuisance "do[es] not have to wait [for] the actual infliction" of the loss before seeking injunctive relief. *Sharp II*, 1996 OK 109, ¶ 16, 925 P.2d at 552 (citing *Baker v. Ellis*, 1956 OK 26, ¶ 13, 292 P.2d 1037, 1039); *see also Town of Rush Springs v. Bentley*, 1919 OK 203, ¶ 12, 182 P. 664, 665 (affirming injunction against construction of a town sewer basin and septic tank near residences).

*Sharp* itself involved a permitted facility that had not yet been built. The Oklahoma Supreme Court affirmed a temporary injunction anyway, holding that the permitting statute did

not displace the common-law anticipatory nuisance action and that a court may enjoin a permitted facility where the approved safeguards are insufficient to prevent a nuisance at the particular location. *Sharp v. 251st St. Landfill, Inc. (Sharp I)*, 1991 OK 41, ¶¶ 15–20, 810 P.2d 1270, 1275–76, *overruled on other grounds by DuLaney v. Okla. State Dep't of Health*, 1993 OK 113, ¶ 1, 868 P.2d 676, 678. After trial, the Court affirmed a permanent injunction absolutely prohibiting construction and operation of the facility, reaffirming that where a business cannot be conducted in any manner at its proposed location without substantial injury to its neighbors, an absolute prohibition at that location is appropriate. *Sharp II*, 1996 OK 109, ¶¶ 16, 32, 925 P.2d at 553, 556. And the Court rejected the argument that "some other non-specified feature or method of protection might exist in the abstract" as a basis to withhold that relief. *Id.* at 552 n.7.

The State can meet that standard without assuming Defendants will violate a single permit condition. Taking Defendants' own numbers at face value, a facility that will emit on the order of 425 tons of fluoride compounds per year,[20] sited within three miles of an agricultural community, will deposit fluoride on the forage that sustains Rogers County's herds, with consequences the veterinary literature has documented for decades: fluorosis, lameness, stunted growth, reproductive failure, and herd loss. Ex. 8 at 14–15; Ex. 6. And face value is generous. The State's engineering expert explains that the Application's assumed capture and control efficiencies—99 to 100 percent capture, 99.96 percent control—are unsupported by any engineering analysis, and that modestly lower real-world performance would push fluoride emissions well above 1,000 tons per year. Sahu Decl. ¶¶ 13–15. Even at 425 tons, the facility would out-emit every plant in the

---

[20] Ex. 5, PSD Appl., Table 2: Other Pollutants Facility-Wide [Potential to Emit], at 7–8 (indicating total fluoride potential emissions of 425.5 tons per year); App'x B Emissions Calculations at second page of calculation tables (showing calculations for total fluoride emissions of 425.5 tons per year).

United States—in any industry—reflected in the most recent National Emissions Inventory. *Id.* ¶¶ 19–22 & tbls. 1–2. In fact, the highest-emitting primary aluminum smelter in that inventory reported roughly 131 tons per year, less than one-third of what Defendants intend. *Id.*

The probability of harm flows from the design of the project, not from any assumption of malfunction. Defendants' record of violations, fines, and settlements at the facilities they already operate forecloses any assurance that the Inola facility will outperform its permits. Pet. ¶¶ 26–28; *see* Ex. 23, *McDaniel*, Doc. 79 at 3, 7.[21] And DEQ's technical review points the same direction. The agency has advised Defendants that their proposed fluoride limits do not represent the maximum achievable reduction, that their own emission calculations exceed the very limit they propose, and that comparable smelters, including Century's own, hold permits requiring less. *Supra* pp. 6–7. Nor do the deficiencies DEQ identified render the State's showing speculative, because they run in only one direction: Defendants' own calculations disclose more fluoride than their own proposed limit would allow. The current record understates the threat; it does not overstate it.

**B.    Neither a Pending DEQ Permit Nor OKLA. STAT. tit. 50, § 4 Shields the Project.**

Defendants will likely respond that this motion is premature while their permit application is pending before the Oklahoma Department of Environmental Quality, or that a permit, once issued, would immunize the project. Oklahoma law forecloses both arguments. A permit is not a license to commit a nuisance: "[l]icensing is not in itself enough to avoid liability." *Union Oil Co. of Cal. v. Heinsohn*, 43 F.3d 500, 503–04 (10th Cir. 1994) (applying Oklahoma law; state air-quality permits, issued on a showing that the plant design used the best control technology, did not preclude nuisance liability). The Oklahoma Supreme Court has said the same for decades: "[a]

---

[21]    *See also* Ex. 25.

license, permit or franchise to do a certain act cannot protect the licensee who abuses the privilege by erecting or maintaining a nuisance." *Briscoe v. Harper Oil Co.*, 1985 OK 43, ¶ 10, 702 P.2d 33, 36. If anything, the pendency of the application cuts against Defendants. In accordance with state regulations, DEQ has suspended its review because the application's best-available-control-technology analysis, emission calculations, and modeling require correction and supplementation. *Supra* p. 6. There is no imminent agency determination for this Court, or for Defendants' construction schedule, to await. And there is no tension in the State's reliance on DEQ's letter. Whether a permit could immunize a nuisance is a question of law, and it cannot; what Defendants' own emission calculations show is a question of fact, and DEQ's review of those calculations is competent evidence of it.

Nor will OKLA. STAT. tit. 50, § 4, which provides that nothing "done or maintained under the express authority of a statute" can be deemed a nuisance, supply a defense. Section 4 requires a statute that specifically authorizes the particular activity, in the particular manner, at the particular place. A regulatory framework that merely empowers an agency to issue permits is not "express authority of a statute" for whatever a permittee later builds; the Oklahoma Supreme Court has "never ruled approval of an activity by an administrative agency *alone* is sufficient to transform what would otherwise be considered a nuisance, abatable or subject to injunction, into a legalized nuisance impervious to such forms of relief." *Sharp I*, 810 P.2d at 1274 n.4; *see also E.I. Du Pont de Nemours Powder Co. v. Dodson*, 1915 OK 256, ¶ 6, 150 P. 1085, 1087 (defense applied where the governing statute required approval of the particular site by an official with statutory authority, and that approval had been given); Okla. Att'y Gen. Op. No. 97-30, ¶ 14 (May 5, 1997) (the critical question is whether the statute authorizes the challenged activity or merely the general enterprise); *B.H. v. Gold Fields Mining Corp.*, 506 F. Supp. 2d 792, 806–07 (N.D. Okla. 2007) (rejecting § 4

defense premised on general statutory authorization); *State ex rel. Drummond v. Tyson Foods, Inc.*, 653 F. Supp. 3d 937, 1050–51 (N.D. Okla. 2023) (state-approved waste-management plans did not immunize producers under § 4 because they did not specifically authorize the hazard-creating conduct).

*Laubenstein v. BoDe Tower, L.L.C.*, 2016 OK 118, 392 P.3d 706, is no help to Defendants either. The Court there rejected a nuisance claim against a lawfully constructed cellular tower because the claim rested entirely on the plaintiff's aesthetic sensitivities, not because any statute expressly authorized the tower; § 4 appears only in a footnote correcting the Court of Civil Appeals' reading of *Du Pont. Id.* ¶ 3 n.5, 392 P.3d at 708 n.5. Even that footnote confirms what § 4 requires: "approval of the particular site by a person with statutory authority to issue such a finding." *Id.* No official with statutory authority has approved the Inola site, and the air-quality permit Defendants seek would, if it ever issues, address emissions rather than confer a statutory judgment that a smelter belongs at this location. *Laubenstein* instead reaffirms the very line this claim occupies: nuisance liability reaches pollution that works physical injury to property, including hydrocarbons that "poisoned cattle grazing on plaintiff's property." *Id.* ¶ 12, 392 P.3d at 710–11 (citing *Nichols v. Mid-Cont. Pipe Line Co.*, 1996 OK 118, 933 P.2d 272).

The Oklahoma Clean Air Act empowers DEQ to administer a permitting program, OKLA. STAT. tit. 27A, § 2-5-105(2); it does not command that any particular facility's emissions be deemed lawful regardless of their effects on neighbors. The same is true of the Reindustrialize Oklahoma Act of 2025, H.B. 2781 (2025), under which the State has committed an incentive package to this project. Ex. 36, H.B. 2781. A generally applicable investment-rebate program says nothing about emissions, siting, or nuisance, and an economic-development statute without environmental specificity cannot supply "express authority" under § 4. *Cf. Gold Fields*, 506 F. Supp. 2d at 806–07

(statutes concerned with economic interests rather than environmental regulation cannot legalize a nuisance).

*Sharp* itself refutes any suggestion that the permitting process displaces this action. The landfill there was enjoined although permitted, temporarily in *Sharp I* and absolutely in *Sharp II*, and *McPherson* and *Rush Springs* enjoined threatened nuisances with no permit in the picture at all. Whether Defendants' application is granted, denied, or still pending, the nuisance question remains the same, and equity need not stand by while a reasonably certain harm is built. For the same reason, there is no occasion for "primary jurisdiction" deference to the pending permit review. DEQ decides whether a permit will issue; only a court can decide whether the facility would constitute a nuisance at this location. *Sharp I* holds that the permitting scheme does not displace that judicial question, 810 P.2d at 1275–76, and because "[a] license, permit or franchise" cannot authorize a nuisance, *Briscoe*, 702 P.2d at 36, an injunction here threatens no conflict with anything DEQ may lawfully do.

### C.     In the Alternative, the State Is Likely to Succeed Under the Oklahoma Environmental Quality Code.

The Oklahoma Environmental Quality Code makes it unlawful to cause pollution of the waters of the State or to place wastes where they are likely to cause pollution of the air, land, or waters of the State. OKLA. STAT. tit. 27A, § 2-6-105(A). Defendants' plan to route the smelter's industrial process wastewater through an existing treatment facility that was neither designed nor permitted to treat the volume or character of primary-smelter waste, Pet. ¶ 32, is likely to cause exactly the pollution the Code forbids. *Supra* p. 10, Exs. 28, 29. The State is entitled to equitable relief restraining Defendants from proceeding in that manner. Pet. ¶ 42.

**II.    The Threatened Harm Is Irreparable: Fluoride Cannot Be Recalled from Bone, Pasture, or Water.**

Irreparable harm must be "certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks omitted). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Certainty is not required: a significant risk of harm that cannot be compensated after the fact by money damages satisfies the requirement. *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). And Defendants' own proposal reveals that the smelter will emit on the order of 425 tons of fluoride compounds per year. Pet. ¶ 19. The injuries flowing from that threat fit that description exactly. Fluoride accumulates irreversibly in bone and teeth. The animals' teeth wear away until they cannot eat; their bones thicken, deform, and fracture; they go lame, stop growing, stop milking, and stop breeding. Pet. ¶¶ 20–21, 33; Ex. 8 at 7, 14–15; Ex. 6 at 4–5 (together documenting osteosclerosis, exostosis, hyperostosis, osteoporosis, osteomalacia, and rickets). Contaminated pasture cannot be made safe for the herds that graze it, and neither a family's health nor a working cattle operation can be restored by a damages award. Pet. ¶ 33; *see Reynolds Metals*, 258 F.2d at 323–25. Century's Mount Holly settlement illustrates the limits of after-the-fact compensation: the $944,000 fund paid roughly $700 per property owner for harm already inflicted. Ex. 23, *McDaniel*, Doc. 79 at 7. *Sharp II* affirmed an absolute prohibition on a permitted facility precisely because the threatened injury there was irreparable in damages, 1996 OK 109, ¶ 16, 925 P.2d at 553; equity does not require a community to absorb an irreversible injury and then litigate its price.

Additionally, recent disclosures concerning ownership, governance, and compliance matters support the injunction, preserving the status quo and allowing further inquiry before any

construction begins. As detailed above, Century filed the Iran Threat Disclosure on March 3, 2026. Federal law takes such disclosures seriously: the notice is transmitted to the President and Congress, and the statute contemplates a presidential investigation into whether sanctionable activity occurred. *See* 15 U.S.C. § 78m(r)(4)–(5).[22] At a minimum, regulatory agencies could require closer examination, impose reporting obligations, or enforce corrective measures before construction can proceed. And an injunction affords Inola additional time to fully vet these matters before the moratorium lapses on August 28.

At bottom, these matters—touching foreign control, concentration of commercial leverage by an offtake counterparty-shareholder, and sanctions-related disclosures—underscore the risk that, once construction begins and sunk costs accumulate, corporate decision-making may prioritize completion and operation over community protections, even in the face of emerging harms. In that posture, fluoride and other environmental injuries would continue accumulating in cattle bone and local forage—injuries that, as shown above, cannot be unwound with money damages—further strengthening the need for preliminary relief to prevent irreversible harm.

The harm is imminent as well. The moratorium expires on or about August 28, 2026, and Defendants have engaged contractors, secured funding, and publicly represented that construction is expected to begin this year. *Supra* pp. 1, 11. The permit Defendants describe as a precondition of construction is months away at best; DEQ's review is suspended pending Defendants' own supplemental submissions, the last of which is not due until September 26, 2026. *Supra* pp. 6–7.

---

[22] Emirates Global Aluminum, the other co-owner, is owned by Mubadala Investment Company of Abu Dhabi and Investment Corporation of Dubai. Mubadala is a sovereign wealth fund of the United Arab Emirates and maintains significant partnerships with China. *Supra* note 7. These facts raise nondisclosure and compliance concerns that directly affect the public interest and equitable analysis.

If construction begins this year, it begins before any permit issues. And ranchers within reach of the fallout will not have the luxury of waiting to see: prudent operators must begin protective planning—forage testing, altered stocking, relocation contingencies—before the first potline energizes, not after. Each day of construction will also change the litigation itself, because Defendants will offer their accumulating sunk costs as an equity against relief. The time to preserve the status quo is now, while it still exists.

### III. The Balance of Equities Tips Decidedly in the State's Favor.

On one side of the balance is time. An injunction would delay construction of a project whose lawfulness under Oklahoma law has never been adjudicated, and whose developers chose to continue their construction timeline while this suit is pending. Delay of that kind is the ordinary incident of contested litigation, and Defendants assumed the risk of it. The project's financing underscores the point. Defendants are not building primarily at their own risk; the project is propelled by an extraordinary infusion of public money, including a federal award of up to $500 million and Oklahoma's commitment of approximately $255 million in performance-based rebates under the Reindustrialize Oklahoma Act of 2025. Pet. ¶¶ 12, 31; *supra* p. 11. A developer building with the public's money has a diminished claim to outrun a judicial determination of the project's lawfulness, and the public that is financing the project has a heightened interest in obtaining one. On the other side of the balance is permanence: fouled air, contaminated water, poisoned forage, harmed wildlife, ruined herds, and injured health, losses no judgment can restore. Pet. ¶ 33. Defendants have no cognizable interest in commencing what the State is likely to prove would be a public nuisance, and a lawful project loses nothing but a relatively short amount of time from a brief preservation of the status quo.

**IV.     A Preliminary Injunction Serves the Public Interest.**

The Clean Air Act's findings name the very injury threatened here: air pollution has "resulted in mounting dangers to the public health and welfare, including injury to agricultural crops and livestock." 42 U.S.C. § 7401(a)(2). Congress itself declared that "air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments." § 7401(a)(3). The public interest lies in the enforcement of Oklahoma's duly enacted nuisance and environmental laws, in the protection of the health of Inola's families, and in the preservation of the livestock economy and the natural resources on which the region depends. Pet. ¶ 23; *supra* pp. 5–10. The people of Inola have spoken for themselves; their elected council paused this project to study precisely the harms alleged here. An injunction asks only that the pause the community imposed not lapse into groundbreaking while the courts decide whether the project is lawful. Nor is that interest diminished by the project's asserted national importance: no policy of the United States requires that a facility be built where it would constitute a public nuisance, and the choice of a lawful site remains Defendants' to make.[23]

The public fisc is in the balance as well. Oklahoma has committed roughly $255 million in taxpayer-funded rebates to this project, rebates that will flow to foreign-owned companies. Pet. ¶

---

[23]     The project's own champions acknowledge that Inola is not the only available site. The President of the United States has indicated that other states would welcome the smelter. Ex. 37, Truth Social post of President Donald J. Trump, dated June 18, 2026 (as republished by KOCO News 5, June 18, 2026). Governor Stitt has likewise warned that other states stand to receive the investment and its benefits if the project is built elsewhere. Ex. 38, Governor Kevin Stitt's Facebook Post, dated June 29, 2026. The reality is that the State does not oppose domestic aluminum production. The question presented is where the smelter may lawfully be built as currently intended, not whether aluminum will be made in America, and an injunction addressed to this site conflicts with no federal policy.

12.[24] The Legislature made those rebates performance-based, earned over a rebate period running through July 1, 2045, rather than paid up front, so a pause forfeits nothing under the program. Ex. 36, H.B. 2781, § 4A. Construction of a facility later adjudged a nuisance, by contrast, would squander the public's investment along with the community's health. The taxpayers' commitment strengthens, rather than weakens, the public's interest in having the project's lawfulness decided before their money and their health are committed to it.

## V.  No Security Should Be Required.

Rule 65(c) vests the Court with "wide discretion" in setting the amount of security, including requiring none. *See Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782–83 (10th Cir. 1964). Oklahoma law goes further: in an action brought in the name of the State to enjoin and suppress a nuisance, "no bond shall be required." OKLA. STAT. tit. 12, § 1397. The State brings this action in its sovereign capacity to enforce its own laws for the protection of its people and natural resources, and the Court should require no bond, or at most a nominal one. A bond would be especially inappropriate here, where the project it would protect is financed in substantial part by public money, including the State's own $255 million incentive commitment. Defendants cannot ask the sovereign to post security against delay of a project the sovereign's taxpayers are funding. And because the rebates are performance-based and remain available through July 1, 2045, preserving the status quo forfeits none of them. *See* Ex. 36, H.B. 2781, §§ 3A, 4A.

---

[24] Ex. 39, Oklahoma Primary Aluminum Answers Center, *How much of Oklahoma Primary Aluminum is American owned?* (explaining that Emirates Global Aluminum, a United Arab Emirates company, owns 60% of the joint venture, and Chicago-based Century Aluminum owns the remaining 40%); Ex. 33, Oklahoma Primary Aluminum Answers Center, *Is the project, EGA or Century Aluminum directly taking money from Oklahoma taxpayers?* (describing a State-funded LEAD package of $255 million).

**CONCLUSION**

For these reasons, the State respectfully requests that the Court: (1) resolve the pending Motion to Remand, Doc. 11, and, if the case is remanded, transmit this motion with the record to the District Court of Rogers County; (2) otherwise, enter a preliminary injunction restraining Defendants, their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them, *see* Fed. R. Civ. P. 65(d)(2), from commencing or continuing construction of the Inola primary aluminum smelter, including site preparation, grading, and foundation work, pending final judgment; (3) require no security under Rule 65(c); (4) grant expedited consideration in light of the moratorium's expiration on or about August 28, 2026; (5) if the Court entertains any stay of these proceedings, condition that stay on preservation of the status quo pending its disposition; and (6) grant such other relief as is just.

Respectfully submitted,

/s/ Gentner Drummond
GENTNER DRUMMOND, OBA #16645
    *Attorney General*
GARRY M. GASKINS, II, OBA #20212
    *Solicitor General*
JENNIFER L. LEWIS, OBA #32819
    *Deputy Attorney General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Gentner.Drummond@oag.ok.gov

*Counsel for the State of Oklahoma*

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2026, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing, which will transmit a Notice of Electronic Filing to the following ECF registrants: J. Christopher Davis, Kayci Bair Hughes, Bradley W. Welsh, Donald K. Shandy, and Timila Rother, Crowe & Dunlevy, attorneys for Defendants.

/s/ Gentner Drummond
Gentner Drummond