# Exhibit 1

Information Classification: Confidential

Contract Ref: LEG-EGA2025220

## MEMORANDUM OF UNDERSTANDING (NON-BINDING)

## IN RELATION TO THE DEVELOPMENT OF AN ALUMINIUM SMELTER IN THE UNITED STATES OF AMERICA

## BETWEEN

## EMIRATES GLOBAL ALUMINIUM PJSC

## AND

## THE OFFICE OF GOVERNOR J. KEVIN STITT

This Memorandum of Understanding ("MoU") is effective on the date of the signature of the last Party to execute this MoU.

Information Classification: Confidential

| | | Commercial Appendix |
|---|---|---|
| 1 | First Party | **Emirates Global Aluminium PJSC**, a private joint stock company incorporated in the Emirate of Abu Dhabi, with trade license number CN-1771938. **Address:** P.O. Box 109111, Abu Dhabi, United Arab Emirates. |
| 2 | Second Party | The Office of Governor J. Kevin Stitt. **Address:** 2300 N. Lincoln Blvd., Suite 212, Oklahoma City, OK 73105. |
| 3 | Opportunity | The First Party (directly and/or through any member of the First Party Group) and the Second Party (directly and/or through its Affiliates) wish to collaborate in order to facilitate the First Party's potential development of a greenfield aluminium smelter, cast house and ancillary facilities in the United States of America (the **Smelter**), as further detailed in Article 2 of this MoU. |
| 4 | Effective Date | The Effective Date is the date of this MoU. |
| 5 | Term | The Term of this MoU shall be for a period of three (3) years from the Effective Date, unless terminated earlier in accordance with the provisions of this MoU. |
| 6 | Address for Service of Notices | **First Party:**<br>Attention: Abdulnasser Bin Kalban<br>Postal Address: P.O. Box 3627, Dubai, United Arab Emirates<br>Email Address: ankalban@ega.ae with copy to legal@ega.ae<br>**Second Party:**<br>Attention: Governor J. Kevin Stitt<br>Postal Address: 2300 N. Lincoln Blvd., Suite 212, Oklahoma City, OK 73105<br>Email Address: kevin.stitt@gov.ok.gov with copy to benjamin.lepak@gov.ok.gov |

mm

Information Classification: Confidential

**Background**

(A)     The First Party and the Second Party (each a **Party** and together, the **Parties**) wish to enter into this Memorandum of Understanding (**MoU**) to record their intention to initiate and progress discussions in relation to the Opportunity as set out herein.

(B)     This MoU sets out the proposed terms under which the Opportunity is explored.

**IT IS AGREED AS FOLLOWS:**

1        **Definitions**

1.1     In this MoU the following terms have the following meanings:

**Affiliate** means, in relation to the Second Party, any Person that directly or indirectly Controls or is Controlled by or is under common Control with the Second Party;

**Applicable Data Protection Laws** means all applicable data protection and privacy Laws that apply to Parties' performance under this MoU and any laws, regulations, and official interpretations thereof pertaining to the collection, use, disclosure, security or protection of personal data, or to a security breach notification;

**Authorised Recipient** means, in relation to a Receiving Party, its Affiliates, and their respective Personnel, professional advisers (including financial advisers, legal counsel, auditors, insurers and accountants) and contractors;

**Business Contact Information** means all contact information given by the Parties in relation to this MoU, including names, email addresses, phone numbers and addresses;

**Business Day** means a day, other than a Saturday, Sunday or public holiday on which commercial banks in the UAE or in Oklahoma, the United States of America are not open to the general public for business;

**Conditions** has the meaning given to it in Section 3 of Schedule 1 of this MoU;

**Confidential Information** means:

(a)     the content of this MoU and any other documents relating to the Opportunity, including drafts of such documents and the existence and contents of any negotiations prior to their execution;

(b)     the Joint Efforts and any Work Product resulting therefrom (in whatever form);

(c)     the meetings and activities of any committee, team or panel formed by the Parties in connection with the Opportunity and any documents produced thereby;

(d)     the existence of any dispute or arbitration in relation to this MoU, including the existence of any arbitral proceedings, the submissions made by the Parties in such proceedings and the decisions made by the arbitral tribunal, including its awards; and

(e)     any discussions or negotiations between the Parties pertaining to the matters set out in paragraphs (a) to (d) above,

but excludes any information which:

mm

---

Information Classification: Confidential

(i) at the time of its supply by (or on behalf of) a Party, is in, or subsequently comes into, the public domain, except by the breach of any of the undertakings set out in this MoU;

(ii) is in or subsequently comes lawfully into the possession of either Party or any of its Authorised Recipients from a third party who does not owe the Party to which the Confidential Information relates an obligation of confidence in relation to such Confidential Information;

(iii) was independently developed by the Receiving Party or any of its Authorised Recipients without any reliance on any part of the Confidential Information of the Disclosing Party; or

(iv) the Parties agree in writing is not confidential.

**Control** means that a Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other relevant Person, whether through the ownership of voting shares, by contract or otherwise, and **Controls** and **Controlled** shall have corresponding meanings;

**Disclosing Party** means a Party who discloses Confidential Information;

**Effective Date** has the meaning given to it in Paragraph 4 of the Commercial Appendix;

**First Party Group** means Emirates Global Aluminium PJSC and each Person directly or indirectly Controlled by Emirates Global Aluminium PJSC;

**Intellectual Property Rights** means patents, rights to inventions, utility models, copyright and related rights, trade marks, business names and domain names, rights in get-up, goodwill and the right to sue for passing off, rights in designs, database rights, rights to use, and protect the confidentiality of, confidential information (including know-how and trade secrets) and all other intellectual property rights, in each case whether registered or unregistered and including all applications and rights to apply for and be granted, renewals or extensions of, and rights to claim priority from, such rights and all similar or equivalent rights or forms of protection which subsist or will subsist now or in the future in any part of the world;

**Joint Efforts** means any efforts, activities, actions, negotiations or discussions undertaken or to be undertaken by either Party or both Parties in relation to, or in furtherance of, the Parties' joint collaboration in respect of the Opportunity;

**Law** means all applicable national and international laws including treaties, statutes, decrees, edicts, codes, orders, instructions, judgements, rules, ordinances and regulations of any governmental authority, as amended or re-enacted or in any other way modified from time to time and all instruments, orders, plans, regulations, by-laws, permissions and directions at any time made thereunder;

**Opportunity** has the meaning set out in Paragraph 3 of the Commercial Appendix;

**Person** shall be broadly interpreted to include, without limitation, any Party, corporation, company, partnership, other entity or individual;

**Personnel** means, in relation to a Person, the senior executives, directors, officers, employees or secondees of such Person;

**Receiving Party** means a Party who receives Confidential Information;

MM

Information Classification: Confidential

**Smelter** has the meaning given to it in Paragraph 3 of the Commercial Appendix;

**Term** has the meaning given to it in Paragraph 5 of the Commercial Appendix;

**TIF** has the meaning given to it in Section 3 of Schedule 1 of this MoU;

**UAE** shall mean the United Arab Emirates;

**USD** means United States Dollars; and

**Work Product** means any work product produced in connection with, or as a result of, the Joint Efforts.

2       **Scope of the Opportunity and key conditions**

2.1     The Parties acknowledge and agree that the Opportunity shall be based on the key principles and particular parameters outlined in the non-binding commercial terms set out in Schedule 1 of this MoU.

2.2     The Parties acknowledge and agree that:

2.2.1     full details of the Opportunity; and

2.2.2     the specific terms and conditions that the Opportunity will be subject to,

shall be negotiated between themselves in good faith and set forth in the definitive written agreements to be entered into by the Parties in connection with the Opportunity.

3       **Opportunity and Intellectual Property Rights**

3.1     This MoU is non-binding (except where expressly stated to the contrary in this MoU) and shall facilitate good faith discussions and negotiations in relation to the Opportunity between the Parties.

3.2     Each Party shall retain ownership of its pre-existing Intellectual Property Rights and each Party shall, at the other Party's request and subject to any third-party rights and restrictions, grant to the other Party a royalty-free, non-exclusive licence to use and copy the other Party's pre-existing Intellectual Property Rights to the extent necessary for the purpose of this MoU as set out in Article 3.1.

3.3     In the case of any Intellectual Property Rights created jointly by employees of both Parties, the Parties shall discuss and agree who will own the relevant Intellectual Property Rights and record such agreement in writing.

4       **Term and Termination**

4.1     This MoU shall commence on the Effective Date and shall continue in force for the Term, unless and until terminated in accordance with the terms of this MoU.

4.2     Either Party may terminate this MoU, for whatsoever reason, by giving at least thirty (30) days' notice in writing to the other Party at any time.

4.3     Either Party may terminate this MoU immediately:

4.3.1     if the other Party becomes insolvent or is subject to a change of Control; or

mm

Information Classification: Confidential

4.3.2    if the other Party is in breach of Articles 6, 7 or 8.

4.4    The provisions of Articles 6, 8.2, 8.5, 8.6 and 10 shall nevertheless survive any expiry or early termination of this MoU.

**5    Legal Effect**

5.1    Except as otherwise set out in Article 5, this MoU shall not be binding on the Parties and shall not create any legally binding obligations on either Party. For the avoidance of doubt, nothing in this MoU shall obligate either Party to proceed with any transaction, partnership, joint venture and/or to enter into any further agreements.

5.2    Articles 1, 4, 5, 6, 7, 8, 9 and 10 of this MoU shall be binding upon the Parties.

**6    Confidentiality**

6.1    Subject to Article 6.3, the Receiving Party shall not (and shall procure that its respective Authorised Recipients do not), without the prior written approval of the Disclosing Party:

6.1.1    disclose any Confidential Information to any Person; and

6.1.2    use the Confidential Information for any purpose other than for the performance of its obligations under this MoU.

6.2    The Receiving Party shall use the same degree of care, but no less than reasonable efforts, to safeguard the confidentiality of any Confidential Information that it would use to safeguard the confidentiality of its own Confidential Information of like kind.

6.3    Notwithstanding Article 6.1, each Party may disclose Confidential Information:

6.3.1    to an Authorised Recipient, provided that such Authorised Recipient:

(a)    needs access to the Confidential Information for the purpose of, or in connection with, the Opportunity; and

(b)    unless already subject to a professional obligation of confidentiality, provides an undertaking of confidentiality no less onerous than those obligations set out in Articles 6.1 and 6.2;

6.3.2    to extent required by Law, by a governmental authority or in connection with any court, judicial or other similar proceedings, provided that the Receiving Party uses its reasonable commercial efforts to, and only to the extent permitted by Law:

(a)    provide the Disclosing Party with prompt notice of such requirement to disclose Confidential Information so as to enable the Disclosing Party to:

i)    seek an appropriate protective order or other remedy in respect of such disclosure; or

ii)    consult with the Receiving Party on taking steps to resist or narrow the scope of such disclosure; and

(b)    disclose only that part of the Confidential Information required to be disclosed and not otherwise subject to a protective order or other remedy.

Information Classification: Confidential

6.4     Each Party will be responsible for any breach of the terms of this Article 6 by any of its Authorised Recipients.

6.5     Each Party acknowledges that damages may not be an adequate remedy for breach of this Article 6 and each Party therefore agrees that the Party affected by a breach of this Article 6 shall be entitled to an injunction, specific performance or other equitable relief, in addition to other remedies available at law.

7     **Assignment**

Neither Party shall assign, novate or transfer any of its rights, obligations or interests under and in connection with this MoU without the prior written consent of the other Party.

8     **General Provisions**

8.1     This MoU contains the entire agreement between the Parties concerning the Opportunity and supersedes all previous agreements written or oral, relating to the Opportunity. No modifications to this MoU or a waiver of the terms of this MoU will be binding upon the Parties, unless approved in writing and signed by each of the Parties.

8.2     In order to protect the legitimate business interests of each Party and their respective Affiliates, each Party undertakes and covenants with the other Party for itself and on behalf of each of its Affiliates, that it shall not (and shall procure that its Affiliates shall not), except with the prior written consent of the other Party, (i) attempt to solicit or entice away, (ii) solicit or entice away, (iii) employ or engage, and/or (iv) otherwise facilitate the employment or engagement of, a Restricted Person. Both Parties shall be bound by the undertaking and covenant set out in this Article 8.2 during the term of this MoU and for a period of 2 years after termination or expiry of this MoU. For the purposes of this Article 8.2, a "**Restricted Person**" shall mean any person employed or engaged at a senior manager grade or above by the other Party or any Affiliate of the other Party during the term of this MoU, that was involved in any way with the communications between the Parties (whether oral or written) in connection with this MoU.

8.3     Any provision in this MoU which is illegal, void or unenforceable will be ineffective to the extent only of such illegality, voidness or unenforceability and such illegality, voidness or unenforceability will not invalidate any other provision of this MoU.

8.4     Nothing in this MoU is intended to, or should be construed as, requiring any Party to enter into any business relationship or transaction with any other Party, or as imposing an obligation on either Party to continue discussions or negotiations in connection with the Opportunity.

8.5     The Parties shall comply with all applicable requirements of Applicable Data Protection Laws including any obligations in respect of the collection, processing, or transfer of data under this this MoU, including personal and/or sensitive data. This Article 8.5 is in addition to, and does not relieve, remove or replace, a Party's obligations or rights under any Applicable Data Protection Laws.

8.6     In the event that, pursuant to this MoU, personal and/or sensitive personal data (as defined under Applicable Data Protection Laws) of any individual is provided by one Party to the other Party or a Party otherwise comes into possession of such data, that Party shall not, by act or omission, (i) breach its obligations under Applicable Data Protection Laws, and/or (ii) cause the other Party or any member of the other Party's group to breach its obligations under Applicable Data Protection Laws, whether such breach is in relation to the personal/and or sensitive personal data of any individual or otherwise. For the avoidance of doubt, the Parties agree and acknowledge that Business Contact Information is not considered to be personal and/or sensitive

*mm*

Information Classification: Confidential

personal data. In the event that personal and/or sensitive personal data is required to be shared pursuant to this MoU, the Parties agree to promptly enter into a formal data processing agreement.

8.7    No failure or delay in exercising any right, power or privilege under this MoU will operate as a waiver, nor will any single or partial exercise thereof preclude any other or further exercise of that right, power or privilege or exercise of any other right, power or privilege under this MoU.

8.8    No partnership or joint venture shall exist between the Parties by virtue of this MoU and nothing herein shall constitute a Party as agent, fiduciary or trustee for the other Party.

8.9    This MoU shall bind each Party's heirs, successors and assigns however save as expressly set out in this MoU, a Person who is not party to this MoU shall have no right to enforce any of its terms.

8.10   The Parties shall comply with the data protection policies of the First Party (available at https://www.ega.ae/en/about-us/our-policies-and-certifications) and all applicable data protection requirements therein.

8.11   Each Party will pay the costs and expenses incurred by it in connection with the negotiation, preparation, execution and implementation of this MoU.

8.12   This MoU may be executed in any number of counterparts, each of which, when executed, shall be an original, and all the counterparts together shall constitute one and the same instrument.

9    **Governing Law and Dispute Resolution**

9.1    This MoU shall be governed by, and construed in accordance with, the laws of the State of Oklahoma, without regard to any conflict of law provisions.

9.2    The Parties shall attempt in good faith to amicably settle any dispute, controversy or claim arising out of or in connection with the conclusion, validity, effect, interpretation, performance, termination or dissolution of this MoU and/or any non-contractual obligations arising out of or in connection with this MoU (**Dispute**). If the Dispute is not settled amicably within thirty (30) days from the date the Dispute is first notified in writing to the other Party, such Dispute shall be referred by any Party for resolution as set out in Article 9.3. Despite the existence of a Dispute, the Parties shall continue to perform their respective obligations under this MoU.

9.3    Any controversy or claim arising out of or relating to this MoU, or the breach thereof, shall be finally and exclusively settled by arbitration administered by the American Arbitration Association. The venue of the arbitration shall be the District Court of Oklahoma County or in the District Court for the Western District of the State of Oklahoma, and the legal seat shall be New York City, New York. The arbitration shall be conducted in the English language by one arbitrator in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

10    **Notices**

10.1   Any notice to be given to a Party under or in connection with this MoU shall be in writing and delivered by hand, courier, or email to the relevant addresses set out in Paragraph 6 of the Commercial Appendix.

10.2   Any notice shall be deemed to have been received at the time of delivery, or, if the time of delivery falls outside business hours in the place of receipt, when business hours resume on the next

Information Classification: Confidential

Business Day. For the purpose of this Article 10.2, "business hours" means 9.00am to 5.00pm on a Business Day.

**IN WITNESS WHEREOF,** this MoU has been executed by duly authorised representatives of the First Party and the Second Party. The Parties agree that this MoU may be executed by electronic signature (whatever form the electronic signature takes), and this method of signature is as conclusive of each Party's intention to be bound by this MoU as if signed by each Party's manuscript signature.

Name:    Abdulnasser Bin Kalban

Designation:    Chief Executive Officer

Signature:

For and on behalf of
**EMIRATES GLOBAL ALUMINIUM PJSC**

Date:  21 April 2025

Name:    J. Kevin Stitt

Designation:    Governor of Oklahoma

Signature:

For and on behalf of
**THE OFFICE OF GOVERNOR J. KEVIN STITT**

Date:  21 April 2025

7

Information Classification: Confidential

## SCHEDULE 1

### KEY NON-BINDING COMMERCIAL TERMS

| No. | Item | Details |
|---|---|---|
| 1. | Opportunity scope | (i) The First Party intends to make an initial capital investment of approximately four billion dollars (USD4,000,000,000) for the development of the Smelter with the expectation of creating between nine hundred (900) and one thousand (1,000) new jobs. <br><br> (ii) The annual production capacity of the Smelter is expected to be approximately six hundred thousand (600,000) tons of primary aluminium. <br><br> (iii) The Smelter is expected to include the following sub-units: <br><br> (a) a potline of four hundred and sixty-four (464) reduction cells along with process equipment (rectifiers, GTC, PTMs, etc.) and ancillary buildings and facilities (compressor stations, lining shops, crucible cleaning, etc.); <br><br> (b) one complete carbon anode area including (green mill, baking kiln, rodding shop, etc.); <br><br> (c) one complete cast house area; and <br><br> (d) a raw material and finished products storage and logistics solution. |
| 2. | Opportunity milestones | (i) Feasibility studies, environmental permitting and air modelling relating to the Opportunity are expected to be launched during H2 of 2025 and completed during 2026. The First Party has shortlisted potential sites for the Smelter and is in the final stages of selecting one of these sites for the purpose of launching the feasibility studies. <br><br> (ii) The expectation is for preparatory site works (in advance of the construction of the Smelter) to commence in 2026. <br><br> (iii) The target is for the Smelter to achieve initial hot metal production during Q4 2029 – Q1 of 2030. |
| 3. | Conditions relating to the Opportunity | (i) The First Party is committed to selecting Oklahoma as the preferred location for the Smelter, to launch feasibility and permitting related studies, provided the following conditions are satisfied towards a viable business case for the Opportunity: <br><br> (a) the First Party having completed its due diligence on the proposed parcel of land for the construction of the Smelter and confirming its suitability; <br><br> (b) the Parties negotiating and agreeing in good faith a power solution framework based on a special rate offer from the Public Service Company of Oklahoma inclusive of a bond credit on generation and |

CS

Information Classification: Confidential

transmission capacity to be added for the project provided by support from the State of Oklahoma that will yield an estimated benefit of approximately sixteen million dollars (USD16,000,000) per year, a discount of up to ten percent (10%) on standard LPL rates including peak, maximum demand charge and monthly energy charge, and a renewable hedge on fuel of up to forty percent (40%) for a portion of the rate to be fixed for the long term; and

(c) the First Party having obtained support from state / local authorities in connection with the Opportunity through the following incentive programmes, based on the terms outlined below which remain subject to further negotiation and agreement between the First Party and the relevant state / local authorities:

(1) an approved development plan for Tax Increment Financing (**TIF**) program mutually agreed by both Parties, with the following arrangement as per the latest discussions:

   o total TIF funds estimated to be approximately five hundred and forty-five million dollars (USD545,000,000) considering one hundred percent (100%) contribution from property taxes, electricity franchise fees for twenty-five (25) years and sales taxes for seven (7) years from the Smelter; and

   o approximately five point seven percent (5.7%) of the TIF revenue to be shared with the city, county, school district and other taxing jurisdictions in Oklahoma and approximately twelve point eight percent (12.8%) to be utilized for community improvements, approximately sixteen point three percent (16.3%) to be utilized for port infrastructure improvements, and approximately forty-nine point five percent (49.5%) for project development; as per utilization as follows:

      ▪ town public infrastructure improvements: approximately twenty-five million dollars (USD25,000,000);

      ▪ school public facilities: approximately forty-five million dollars (USD45,000,000);

      ▪ port infrastructure: approximately eighty-nine million dollars (USD89,000,000);

      ▪ revenue sharing to be distributed among the taxing jurisdictions: approximately five point seven percent (5.7%) or thirty-one million dollars (USD31,000,000); and

      ▪ project development: approximately two hundred and seventy million dollars (USD270,000,000);

Information Classification: Confidential

|  |  | |
|---|---|---|
|  |  | o   some or all of the infrastructure related costs outlined above are expected to be funded through debt issued by an authorized entity in the TIF plan. Such financing costs are also expected to be covered from the total TIF pool;<br><br>(2)   an incentive package of two hundred and fifty-five million dollars (USD255,000,000) in connection with the Opportunity is expected to approved by the Oklahoma Legislature and passed on in an annuity-based program for benefit of the Opportunity;<br><br>(3)   a state sales tax exemption on machinery and equipment and energy used in the manufacturing process for perpetuity, estimated to be approximately one hundred and eighty-six million dollars (USD186,000,000) and twenty-nine million dollars (USD29,000,000), respectively;<br><br>(4)   property and inventory tax exemptions including a full property tax exemption for the first five years, estimated to be approximately one hundred and nine million dollars (USD109,000,000) and an annual inventory tax exemption for perpetuity, estimated to be approximately eight million dollars (USD8,000,000);<br><br>(5)   state income tax offset, estimated to be approximately one hundred and fifty-five million dollars (USD155,000,000) over thirty (30) years of operations, through available ITC credits (approximately two hundred and forty-eight million dollars (USD248,000,000); and<br><br>(6)   Quick Action Closing Fund of twenty million dollars (USD20,000,000), to be combined with the incentive package from the Oklahoma Legislature for a total of two hundred and seventy-five million dollars (USD275,000,000) into an annuity-based program,<br><br>together, the **Conditions**.<br><br>(ii)   The Conditions are based on initial estimates discussed between the First Party and the relevant state / local authorities and remain subject to completion of the First Party's feasibility studies which are expected to yield more accurate estimates on project-related costs.<br><br>(iii)   The Second party is committed to supporting the First Party in connection with the Opportunity and shall facilitate discussions between the First Party and the relevant state / local authorities in order to meet the Conditions.<br><br>(iv)   The Parties acknowledge and agree that the Conditions shall be documented in definitive written agreements between the First Party and the relevant state / local authorities prior to the First Party proceeding with the Opportunity. |
| 4. | Potential site for the Smelter | A potential suitable site for the Smelter is a parcel of land situated within The City of Inola in Rogers County, Oklahoma which is roughly six hundred thirty-three (633) acres in size. The First Party is seeking to enter into a land option |

CS

Information Classification: Confidential

| | | to purchase agreement with the City of Tulsa-Rogers County Port Authority for such parcel of land. |
|---|---|---|
| | | |

CS