**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

(1) STATE OF OKLAHOMA, ex rel. GENTNER DRUMMOND, in his official capacity as ATTORNEY GENERAL OF OKLAHOMA,

Plaintiff,

v.

(1) CENTURY ALUMINUM COMPANY, a Delaware corporation; and;
(2) ALUMINUM OKLAHOMA, LLC d/b/a OKLAHOMA PRIMARY ALUMINUM, LLC,

Defendants.

Case No. 26-cv-00450-SEH-SH

---

**DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

---

J. Christopher Davis, OBA #16639
Kayci Bair Hughes, OBA #18399
Bradley W. Welsh, OBA # 18488
CROWE & DUNLEVY
222 N. Detroit Ave., Suite 600
Tulsa, OK 74120
Telephone: (918) 592-9800
chris.davis@crowedunlevy.com
kayci.hughes@crowedunlevy.com
brad.welsh@crowedunlevy.com

-and-

Donald K. Shandy, OBA#11511
Timila Rother, OBA #14310
CROWE & DUNLEVY
Braniff Building, 324 N. Robinson Ave., Suite 100
Oklahoma City, OK 73102
Telephone: (405) 235-7700
don.shandy@crowedunlevy.com
timila.rother@crowedunlevy.com

**ATTORNEYS FOR DEFENDANTS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

LEGAL AND REGULATORY BACKGROUND ..... 2

ARGUMENT ..... 11

I. The AG's Petition Presents a Substantial Question of Federal Law That Must Necessarily Be Decided for This Action to Proceed. ..... 11

A. The requirements of federal question jurisdiction ..... 13

1. The "necessarily raised" requirement ..... 14

2. The "actually disputed" requirement ..... 19

3. The "substantial" requirement ..... 20

4. The federal-state balance is not disrupted ..... 22

II. The Motion to Remand Provides No Basis for Any Award of Fees and Costs ..... 23

RELIEF REQUESTED ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Electric Power Co., Inc. v. Connecticut*,
564 U.S. 410 (2011)....5, 8, 9, 10, 18, 20, 23, 24

*Bell v. Cheswick Generating Station*,
734 F.3d 188 (3d Cir. 2013)....7, 8

*Board of County Commissioners of Boulder County v. Suncor Energy (U.S.A.) Inc.*,
25 F.4th 1238 (10th Cir. 2022) ....1, 2, 4, 10, 11, 12, 13, 14, 17, 18, 20, 21, 22, 24, 25

*Burlington N. & Santa Fe Ry. Co. v. Grant*,
505 F.3d 1013 (10th Cir. 2007) ....16

*North Carolina ex rel. Cooper v. Tennessee Valley Auth.*,
615 F.3d 291 (4th Cir. 2010) ....6, 7, 10, 15, 21, 24

*Dart Cherokee Basin Operating Co. v. Owens*,
574 U.S. 81 (2014)....12

*Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
463 U.S. 1 (1983)....13

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*,
545 U.S. 308 (2005)....1, 2, 5, 12, 13, 14, 20, 23, 24, 25

*Gunn v. Minton*,
568 U.S. 251 (2013)....2, 14, 20

*Illinois v. City of Milwaukee*,
731 F.2d 403 (7th Cir. 1984) ....15

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987)....5, 6, 8, 15, 24

*Merrell Dow Pharms. Inc. v. Thompson*,
478 U.S. 804 (1986)....20, 21, 22

*Merrick v. Diageo Americas Supply, Inc.*,
805 F.3d 685 (6th Cir. 2015) ....7, 8

*Palumbo v. Waste Techs. Indus.*,
989 F.2d 156 (4th Cir.1993) ....15

*Walker v. Kingfisher Wind, LLC*,
No. CIV-14-914-D, 2016 WL 5947307 (W.D. Okla. Oct. 13, 2016)................................15, 16

**Statutes**

27A O.S. § 2-6-105(A) ....................................................................................................15

50 O.S. § 1 ......................................................................................................................15

28 U.S.C. § 1331 ..............................................................................................................14

28 U.S.C. § 1447(c) ..........................................................................................................23

42 U.S.C. §§ 7401(a), (b)......................................................................................................8

42 U.S.C. § 7409(a)–(b).......................................................................................................3

42 U.S.C. § 7410(a)(1).........................................................................................................3

42 U.S.C. § 7410(a)(1), (k)(2)–(3)........................................................................................3

42 U.S.C. §§ 7411(a)(1), (b)(1)(B), (d)(1).............................................................................8

42 U.S.C. §§ 7411(b)(2), (d).................................................................................................8

42 U.S.C. §§ 7411(c)(1), (d)(1)-(2) .......................................................................................9

42 U.S.C. § 7411(j)(1)(A)......................................................................................................8

42 U.S.C. § 7416..............................................................................................................8, 22

42 U.S.C. §§ 7470–7479...................................................................................................4, 21

42 U.S.C. § 7475(a) ..............................................................................................................4

42 U.S.C. §§ 7604(e) .............................................................................................................8

42 U.S.C. §§ 7604(e) & 7416 ...............................................................................................8

42 U.S.C. § 7661a ..................................................................................................................3

CAA ...............................................................................................................................*passim*

Clean Air Act ..........................................................................................................1, 8, 12, 23

Clean Water Act..................................................................................................................5, 6, 8

**Federal Regulations**

40 C.F.R. § 51 ....................................................................................................................3

40 C.F.R. § 60.22(b)(5)......................................................................................................8

40 C.F.R. § 60.24(f) ..........................................................................................................8

**Other Authorities**

<https://applications.deq.ok.gov/PermitsPublicReview/permitinformation.aspx?id=1072402> ..............................................................................................................2

https://www.epa.gov/nsr/prevention-significant-deterioration-basic-information ..........................1

Defendants respectfully request that the Court deny Plaintiff's Motion to Remand. The Plaintiff's claims for anticipatory injunctive relief cannot be resolved without determining the legal effect of the federal permitting framework administered under the Clean Air Act. This substantial federal question is embedded in the Plaintiff's claims and relief sought, making this case properly within the Court's federal jurisdiction under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005).

## **INTRODUCTION**

Oklahoma's Attorney General ("AG") seeks *anticipatory injunctive relief* to prohibit the construction and operation of a "proposed major stationary source"[1]—an aluminum smelter facility currently undergoing the *federal* permitting process—a process administered by the Oklahoma Department of Environmental Quality ("DEQ") under authority delegated by the Environmental Protection Agency ("EPA") pursuant to the Clean Air Act ("CAA"). To prevail, the AG must prove that the proposed facility's anticipated emissions will be unlawful and injurious. The AG's claims therefore depend upon treating projected emissions contained in a pending permit application as legally operative evidence of unlawfulness, likely pollution, and imminent injury. But those are precisely the determinations that Congress assigned to the EPA and DEQ through the federal permitting process—a process that is still in its infancy and is not close to completion: what emissions levels are permissible, what control technologies must be employed, and whether construction may proceed.

With evident disregard for that federal process, the Motion to Remand filed by the AG opens with a false premise—that the Tenth Circuit's decision in *Board of County Commissioners of Boulder County v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238 (10th Cir. 2022), forecloses

[1] https://www.epa.gov/nsr/prevention-significant-deterioration-basic-information

Defendants' basis for removal. It does not. *Suncor* involved claims for *damages* arising from fossil-fuel sales—claims whose elements could be established entirely under state law without necessary reference to any federal statute or regulatory process. Here, by contrast, the elements of the AG's claims for *injunctive relief* necessarily cannot be resolved without the Court determining the legal effect of the relevant federal permitting framework.[2]

The AG cannot establish the elements of his claims—nor can the Court provide the requested relief—without confronting this substantial federal issue. A federal court "ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable*, 545 U.S. at 312. Because the AG's claims present a federal issue that is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress," *Gunn v. Minton*, 568 U.S. 251, 258 (2013), this case is properly within the Court's federal question jurisdiction.

## LEGAL AND REGULATORY BACKGROUND

Defendants are currently seeking a Prevention of Significant Deterioration ("PSD") construction permit from DEQ to build an aluminum smelter at the Port of Inola. No one disputes that emissions from the proposed smelter are regulated by the federal CAA.[3] What should have

[2] The AG's effort to portray Defendants' position as one for ordinary CAA preemption is wrong. Defendants do not invoke complete preemption and do not contend that the CAA converts the AG's state-law claims into federal claims. Nor do Defendants contend that every dispute touching the CAA is removable. Rather, Defendants invoke the **separate** jurisdictional basis recognized in *Grable*: the claims asserted in the Petition necessarily raise a substantial federal issue because the AG seeks relief that depends upon the legal effect of an ongoing Prevention of Significant Deterioration ("PSD") permitting process established by federal law. Specifically, the AG asks the Court to decide the same source-specific matters Congress assigned in the first instance to the EPA and DEQ, before those agencies do. The federal question is therefore embedded in the AG's requested remedy—not supplied merely by a federal defense.

[3] *See* <https://applications.deq.ok.gov/PermitsPublicReview/permitinformation.aspx?id=1072402>

followed is the process Congress prescribed: DEQ review of the permit application, a public hearing, an opportunity for written comment, a Best Available Control Technology ("BACT") analysis, air-quality modeling, and an ultimate permitting decision by DEQ. Instead, the AG is attempting to short-circuit that process by filing this lawsuit. Relying on projected emissions from that very permit application which is still pending (Pet. ¶ 19), he filed this Petition asking a court to halt construction and impose operating conditions before any permit has issued, any emissions limitations have been set, or any BACT analysis has been completed.

Congress enacted the CAA to coordinate federal and state regulation of air quality through national standards, state implementation plans, and source-specific permitting. It intended to defer to the experience, judgment, and resources of administrative agencies—EPA, and state agencies—rather than ad hoc judicial decisions. More specifically, the CAA directs the EPA to set National Ambient Air Quality Standards ("NAAQS") for pollutants in ambient air considered harmful to public health and welfare. *See* 42 U.S.C. § 7409(a)–(b). States, in turn, are required to develop State Implementation Plans ("SIPs") that employ pollution reduction methods to meet the NAAQS. *See id.* § 7410(a)(1). SIPs must be consistent with extensive EPA regulations governing preparation, 40 C.F.R. § 51, and all SIPs require EPA approval. 42 U.S.C. § 7410(a)(1), (k)(2)–(3). Each state's SIP must include a <u>mandatory permitting program for all stationary sources, including the proposed aluminum smelter facility at issue here,</u> limiting the amounts and types of emissions each source is allowed to discharge. *See id.* § 7661a. The AG's own Petition places this permitting framework directly at issue: the Petition relies on projected emissions drawn from the *pending* DEQ permit application (Pet. ¶ 19) and alleges imminent harm because Defendants have "already applied to the [DEQ] for an air-quality permit" (Pet. ¶ 31).

The CAA also includes the PSD program, designed to ensure that air quality in areas already compliant with NAAQS would not deteriorate. *See* 42 U.S.C. §§ 7470-7479. The PSD program governs the permits Defendants seek. More importantly, construction of the proposed aluminum smelter cannot even begin until: (1) a construction permit issues with conforming emissions limitations; (2) a public hearing is held with opportunity for written or oral comment; (3) the owner demonstrates that emissions will not cause or contribute to air pollution exceeding NAAQS; (4) the proposed facility will utilize the BACT for each regulated pollutant; and (5) the operator agrees to conduct such monitoring as may be necessary to determine the effect which emissions from the facility may have on air quality. *See* 42 U.S.C. § 7475(a).

Under this framework, no major stationary source—including the proposed aluminum smelter facility at the center of this dispute—may be constructed or operated until this process is complete. That fact directly implicates the elements of the AG's claims. Namely, the AG cannot show the requisite unlawful acts, reasonable probability of injury, or that the facility is "likely to cause pollution"—necessary elements of his state law claims—without addressing the federal permitting process and the emissions standards it establishes.

The distinction between this case and the climate-change litigation the AG cites is critical. In *Suncor*, the plaintiffs could prove their claims entirely through state-law elements—traditional tort concepts of wrongdoing, causation, and damages—without requiring any court to interpret or apply a federal statute. *See Suncor*, 25 F.4th at 1267 ("The Municipalities can prevail on their claims without proving any issue of federal law because the success of those claims . . . does not depend on any federal policy or regulation.").

Here, the opposite is true. The AG cannot establish the elements of his claims—nor can the Court provide the requested relief—without confronting the federal permitting framework

head-on. The Supreme Court has clarified that, notwithstanding the strictures of the well-pleaded complaint rule, "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable*, 545 U.S. 308 at 312.

The resulting jurisdictional question is narrow. If the Petition were allowed to proceed to the requested remedy, the Court would have to decide whether it may determine conditions, emissions limitations, monitoring obligations, or operational restrictions for this source before the PSD process has determined them. That question is not whether Oklahoma may ever regulate emissions more stringently or whether state nuisance claims are categorically preempted. It is whether a court may issue an anticipatory injunction that interrupts or supplants the federally prescribed PSD process before permit issuance. The answer depends on the legal effect of the federal permitting framework and is necessarily embedded in the relief sought. That is the federal question presented under *Grable*.

<u>The Relevant Judicial Decisions: From *Ouellette* to *AEP*</u>

To fully evaluate the way in which the AG is interfering with federal law, a survey of the decisions under that legal framework is necessary. The United States Supreme Court has clarified in the context of the similar Clean Water Act that state law is preempted "if it interferes with the methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).[4] That result follows from the realities that "common-law suits [] have the potential to undermine [the] regulatory structure." *Id.* at 497. Indeed, without a single,

[4] Notwithstanding the language of "preemption" utilized in *Ouellette* and subsequent decisions, Defendants are <u>**not**</u> relying upon any theory of complete preemption in support of removal. Instead, Defendants contend that the underlying and recurring theme of these cases—that the use of injunctions to interrupt or disrupt the federal permitting and emissions regulatory framework in the CAA—itself supplies a substantial issue of federal law, necessarily raised, that warrants *Grable* jurisdiction.

consistent system of permitting, "[i]t would be virtually impossible to predict the standard" for lawful emissions, and "[a]ny permit issued . . . would be rendered meaningless." *Ouellette*, 479 U.S. at 497 (emphasis added).

Following *Ouellette*, the Fourth Circuit Court of Appeals faced precisely that issue in *North Carolina ex rel. Cooper v. Tennessee Valley Auth.*, 615 F.3d 291 (4th Cir. 2010). In that case, North Carolina sought and obtained injunctive relief, premised upon a public nuisance theory, against four TVA electricity generating plants in Alabama and Tennessee. The Fourth Circuit explained that the granting of injunctive relief was "flawed for several reasons," as follows:

> If allowed to stand, the injunction would encourage courts to use vague public nuisance standards to scuttle the nation's carefully created system for accommodating the need for energy production and the need for clean air. The result would be a balkanization of clean air regulations and a confused patchwork of standards, to the detriment of industry and the environment alike. . . .

*Cooper*, 615 F.3d at 296. In so concluding, the Fourth Circuit noted that it "need not hold flatly that Congress has entirely preempted the field of emissions regulation," and that "we cannot state categorically that the *Ouellette* Court intended a flat-out preemption of each and every conceivable suit under nuisance law." *Id.* at 303. Nonetheless, the Fourth Circuit identified a "host of reasons why Congress preferred that emissions standards be set through agencies in the first instance rather than through courts":

> The prospects of forum shopping and races to the courthouse, the chances of reversals on appeal, the need to revisit and modify equitable decrees in light of changing technologies or subsequent enactments, would most assuredly keep matters unsettled. Congress opted instead for an expert regulatory body, guided by and subject to congressional oversight, to implement, maintain, and modify emissions standards and to do so with the aid of the rulemaking process and a cooperative partnership with states. In the words of *Ouellette* addressing the similarly comprehensive Clean Water Act, the statute "carefully defines the role of both the source and affected States, and specifically provides for a process whereby their interests will be considered and balanced by the source State and the EPA." 479 U.S. at 497, 107 S.Ct. 805. It is not open to this court to ignore the words of the Supreme Court, overturn the judgment of Congress, supplant the conclusions

> of agencies, and upset the reliance interests of source states and permit holders in favor of the nebulous rules of public nuisance.

*Id.* at 306 (emphasis added).

Notwithstanding the power and logic of its analysis, the Fourth Circuit's decision to vacate the injunctive relief at issue in *Cooper* has not been universally accepted. The principal decisions reaching contrary results are *Bell v. Cheswick Generating Station*, 734 F.3d 188 (3d Cir. 2013) and *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685 (6th Cir. 2015); yet, each does so in a posture different than the posture of this case. In *Bell*, the plaintiffs filed a nuisance action against a coal-fired electrical generation facility that had completed the permitting process, was in operation, and was allegedly producing either a black dust/film or white powder that landed on their yards. In *Merrick*, the plaintiffs similarly asserted a nuisance claim, alleging that a distillery already subject to finalized permits yielded material ethanol vapor emissions that combined with condensate to create "whiskey fungus" on their real and personal property. The emissions at issue in both *Bell* and *Merrick* were also alleged to be in violation of each respective permit's terms.[5] That conclusion follows from (1) references in *Bell* to the relevant permit's specification that the plant operator "may not 'conduct . . . any materials handling operation in such manner that emissions from such operation are visible at or beyond the property line,'" 734 F.3d at 192, and (2) references in *Merrick* to a Notice of Violation letter transmitted to Diageo by the Louisville Metro Air Pollution Control District, *see* 805 F.3d at 689.[6] It also follows from the fact that each of those decisions premised its conclusion that common law nuisance claims were not preempted

---

[5] By contrast, the AG has openly acknowledged that he is seeking to impose emissions regulations by injunction "without assuming Defendants will violate a single permit condition." *See* Mot. for Prelim. Inj. at 15, Dkt. No. 19. That is not an enforcement action as recognized by the CAA.

[6] Of course, the AG has not alleged that Defendants have violated any permit, as DEQ has not issued any permit relevant to the proposed facility at issue.

by the CAA by reference to the two "savings clause" provisions of the statute, 42 U.S.C. §§ 7604(e) & 7416. Section 7604(e), for example, authorizes certain enforcement actions:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

42 U.S.C. §§ 7604(e) (emphasis added); *Bell*, 734 F.3d at 191; *Merrick*, 805 F.3d at 688.[7] Yet, the Supreme Court in *Ouellette* held that the analogous savings clause in the Clean Water Act "did not preserve a broad right for states to 'undermine this carefully drawn statute through a general savings clause.'"

Nor was the Supreme Court's emphasis in *Ouellette* upon the need to vindicate Congressional intent a one-off statement of law. The Supreme Court reiterated that same need as the principal basis for its decision in *American Electric Power Co., Inc. v. Connecticut*, 564 U.S. 410 (2011) (the "*AEP*" decision) in which the Court held that the CAA fully displaced federal common law in the context of claims that sought injunctive relief to cap carbon dioxide emissions prior to any rulemaking by EPA related to greenhouse gas emissions. As explained by the Supreme Court in that decision:

> The Clean Air Act entrusts such complex balancing to EPA in the first instance, in combination with state regulators. Each "standard of performance" EPA sets must "tak[e] into account the cost of achieving [emissions] reduction and any nonair quality health and environmental impact and energy requirements." §§ 7411(a)(1), (b)(1)(B), (d)(1); see also 40 C.F.R. § 60.24(f) (EPA may permit state plans to deviate from generally applicable emissions standards upon demonstration that costs are "[u]nreasonable"). EPA may "distinguish among classes, types, and sizes" of stationary sources in apportioning responsibility for emissions reductions. §§ 7411(b)(2), (d); see also 40 C.F.R. § 60.22(b)(5). And the Agency may waive compliance with emission limits to permit a facility to test drive an "innovative technological system" that has "not [yet] been adequately demonstrated." § 7411(j)(1)(A). The Act envisions extensive cooperation between federal and state authorities, see §§ 7401(a), (b), generally permitting each State to take the first cut

[7] 42 U.S.C. § 7416 authorizes states to enact emissions standards more stringent than those promulgated by EPA.

> at determining how best to achieve EPA emissions standards within its domain, see §§ 7411(c)(1), (d)(1)-(2).
>
> . . . . The expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions. Federal judges lack the scientific, economic, and technological resources an agency can utilize in coping with issues of this order. Judges may not commission scientific studies or convene groups of experts for advice, or issue rules under notice-and-comment procedures inviting input by any interested person, or seek the counsel of regulators in the States where the defendants are located. Rather, judges are confined by a record comprising the evidence the parties present.

*AEP*, 564 U.S. at 427-28 (emphasis added) (internal citation omitted).

Just as in *AEP*, in which the plaintiffs sought injunctive relief requiring each defendant to reduce emissions to levels that they deemed appropriate, irrespective of then-forthcoming guidance from EPA, *see id*. at 419, the AG seeks in this action to substitute the judgment of a court for any permits that DEQ may elect to issue. And, just as in *AEP*, the injunctive relief sought by the AG "cannot be reconciled with the decision-making scheme Congress enacted." *Id.* at 429.

In turn, this case presents the opportunity to decide the question expressly left undetermined by the decision in *AEP*: whether, consistent with the CAA's regulatory framework, the AG can seek injunctive relief that would supplant the regulatory role assigned to DEQ. *See id.* at 429 (noting that "the availability *vel non* of a state lawsuit depends, *inter alia,* on the preemptive effect of the federal Act.").[8] More specifically, this action presents the question whether a court applying state nuisance law may prohibit construction of a major stationary source, or prescribe source-specific operating conditions, before completion of the PSD process established by Congress. That question cannot be answered without determining the legal effect of the federal

---

[8] As the Court likely knows well, a federal statute need not completely preempt state law claims in order to have preemptive effects, such as conflict preemption and field preemption. Irrespective of such categorization, however, Defendants urge that a substantial question of federal law is necessarily raised by the AG's pursuit of injunctive relief in this setting, in which no emissions are presently occurring, and none are even colorable given that the source has not even been built.

permitting framework itself. And both the Supreme Court and the Fourth Circuit have explained that injunctive relief should not be utilized to interfere with the operation of the CAA, whether in the form of rulemaking (*AEP*) or the emissions guidance provided by the permitting process (*Cooper*).

The Tenth Circuit's Decision in *Suncor*

A number of dissimilar greenhouse gas/climate change cases, premised upon state law claims, followed the decision in *AEP*. *Suncor* is one of those many cases. In *Suncor*, various Colorado municipalities sued both Suncor affiliates and ExxonMobil alleging that those defendants caused climate change by enabling fossil fuel consumption. As noted previously, the municipalities asserted a claim for public nuisance but sought only damages as a remedy. *See Suncor*, 25 F.4th at 1248 ("The Municipalities expressly do *not* seek . . . to 'enjoin any oil and gas operations or sales in the State of Colorado, or elsewhere, or to enforce emissions controls of any kind'" (italics in original)). Hence, the question presented by *Suncor* to the Tenth Circuit specifically did not involve the pendency of the CAA's permitting process, or any potential injunctive relief. Indeed, the district court treated the case as one involving only the sale of fossil fuels, which would not be regulated by the CAA in any event. *See id.* at 1263. For that reason, the CAA was incidental to the analysis in *Suncor* and was referenced only because of the policy arguments offered by the defendants in that case. *See, e.g.*, *id.* at 1266 ("The Energy Companies also argue that the Municipalities' nuisance claims necessarily raise a collateral attack on the federal government's "weighing of the costs and benefits of fossil-fuel production and use" and upset the "appropriate balance" regarding that delicate issue struck under federal administrative law."). There was no argument in *Suncor* that the essential function of a federal or state agency empowered to act by Congress would be entirely mooted or overridden by allowing a state law

claim or any remedy to proceed. *See id.* at 1267 (explaining that "the decision in this suit does not 'depend[ ] upon the determination of' any federal policy, order, or regulation that is 'directly drawn in question'").

In short, unlike this action, *Suncor* did not involve a pending federal permitting process, did not involve a request to halt construction of a specific regulated source, did not require a court to determine allowable emissions prior to agency review, and did not seek injunctive relief imposing source-specific operating conditions. The federal interests asserted in *Suncor* were therefore policy considerations collateral to the claims. Here, by contrast, the Petition seeks relief operating directly upon the subject matter of the PSD process itself. For that reason, the permitting process is not simply part of the factual backdrop. It is the object of the requested injunction and the source of the federal questions necessarily raised by the Petition.

## ARGUMENT

### I. The AG's Petition Presents a Substantial Question of Federal Law That Must Necessarily Be Decided for This Action to Proceed.

The AG's Petition relies upon projected emissions contained in a pending permit application and seeks anticipatory relief before any permit has been issued, any emissions limitations have been determined, or any BACT analysis has been completed. By those means, the AG intends (1) to usurp the authority delegated by federal law to DEQ and (2) to assert two state law claims that, he alleges, warrant injunctive relief to halt construction until emissions levels are deemed acceptable to his office. Accordingly, the Petition necessarily raises whether a court may prohibit construction of a source subject to ongoing PSD review or prescribe source-specific operating conditions before DEQ has completed the federally mandated permitting process. And, to be of consequence, any potential injunction must displace the role of DEQ in determining permitted emissions levels, whether in whole or in part. Hence, if any injunction is entered,

Congressional intent will be frustrated. Beyond that, any injunctive relief may also purport to preclude further action by DEQ, in which case the entire regulatory regime will be nullified by the application of state law.

Additionally, although the AG complains on numerous occasions that Defendants' Notice of Removal fails to mention the decision in *Suncor* or to acknowledge its allegedly controlling nature, there is no such requirement. *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81 (2014) requires only notice pleading in stating the basis for removal. Defendants were not required to anticipate the AG's motion to remand and its incorrect premise and plead around it in their Notice, which would require particular omniscience given the AG's misapplication of *Suncor* to this case.

The AG repeatedly characterizes Defendants' position as a preemption-based removal theory. That misstates the basis for removal. Defendants do not invoke complete preemption and do not contend that the Clean Air Act automatically displaces the AG's state-law causes of action. Rather, Defendants invoke *Grable*, which applies when a state-law claim itself necessarily requires resolution of a substantial federal issue. The issue presented here is whether the legal significance of projected emissions contained in a pending PSD application, and the availability of the requested injunction, may be determined without first addressing the federal permitting framework established by Congress. The AG chose a theory and a remedy that require adjudication of the legal effect of the ongoing federal permitting process. That is why this is a *Grable* case, not a preemption case. That distinction is important. The AG's Motion to Remand suggests the Court has a binary choice – either this is complete preemption or it is merely a defense. It is neither. This is a *Grable* case because the federal issue arises from the elements, proof, and injunctive remedy pled in the Petition itself.

### A. The requirements of federal question jurisdiction

As noted by the Tenth Circuit in *Suncor*, the principal basis for invoking federal question jurisdiction is the appearance of a federal question on the face of a plaintiff's pleading. But even when a plaintiff, as the master of his complaint, purports to plead claims that rely exclusively on state law, two exceptions to the well-pleaded complaint rule exist: "(1) the state-law claims are artfully pleaded/completely preempted by federal law and (2) the state-law claims necessarily raise a substantial, disputed federal question." *Suncor*, 25 F.4th at 1255. Defendants' election to remove, in turn, is premised upon the latter, i.e., the presence of a substantial, necessarily raised federal question: Does the AG's pursuit of injunctive relief to prevent construction and operation of the Inola aluminum smelter "except upon such terms and conditions as are necessary to prevent the threatened public nuisance" (Pet., Prayer for Relief) impermissibly interfere with Congress's selection of EPA/DEQ to regulate and administer emissions standards through the CAA's permitting process?

To that end, the Supreme Court has clarified that, notwithstanding the strictures of the well-pleaded complaint rule, "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable*, 545 U.S. at 312. And, as explained in *Suncor*, this is true "[e]ven though state law creates [a plaintiff's] causes of action" because a federal court "can exercise federal-question jurisdiction over an action that pleads only state-law claims if those claims "require[ ] resolution of a substantial question of federal law in dispute between the parties." *Suncor*, 25 F.4th at 1257 (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 13 (1983)).

The AG repeatedly invokes the "master of the complaint" doctrine, asserting that he may avoid federal jurisdiction by exclusive reliance on state law. But that doctrine has limits. While a plaintiff may choose state-law theories and disclaim federal claims, the plaintiff cannot thereby

avoid federal issues that are necessarily embedded in the elements of those state-law claims. *See Grable*, 545 U.S. at 314 ("§ 1331 jurisdiction" extends to "state-law claims that implicate significant federal issues"). Here, the AG has chosen claims whose elements—unlawful conduct, reasonable probability of injury, likely pollution—necessarily require adjudication of the legal effect of the pending federal permitting process. The AG's disclaimer of federal claims cannot erase the federal questions his own theory of proof and requested remedy necessarily raise.

More specifically, the *Grable* standard, as explained in *Suncor*, is as follows: The federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Suncor*, 25 F.4th at 1265 (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)). As in *Suncor*, Defendants believe that elements (2) and (4) are not seriously contested by the AG. Because his Motion to Remand purports to challenge each of the *Grable* elements, however, Defendants will address each of those elements.

**1. The "necessarily raised" requirement**

The AG's claims depend upon treating projected emissions from a pending PSD permit application as legally operative proof of unlawful conduct, likely pollution, and imminent injury. Whether such projections may be accorded that legal effect before completion of the federally mandated PSD process presents a federal question embedded in the Petition itself. The AG's subsequent Motion for Preliminary Injunction confirms that this is not a hypothetical characterization of the Petition; it is the precise theory on which the AG now seeks injunctive relief. *See* Mot. for Prelim. Inj., Dkt. No. 19.

"To determine whether an issue is 'necessarily' raised, the Supreme Court has focused on whether the issue is an 'essential element' of a plaintiff's claim." *Suncor*, 25 F.4th at 1266. The AG's anticipatory nuisance claim requires proof that Defendants will commit an "unlawful" act or

omission, and clear and convincing evidence of a reasonable probability of injury. 50 O.S. § 1; *Walker v. Kingfisher Wind, LLC*, No. CIV-14-914-D, 2016 WL 5947307, at *7 (W.D. Okla. Oct. 13, 2016). Likewise, his Oklahoma Environmental Quality Code claim requires proof that the facility is "likely to cause pollution." 27A O.S. § 2-6-105(A). But the AG's primary evidentiary basis for both claims is projected emissions data drawn from a pending federal permit application that has not yet been evaluated under the PSD process. A federal question is therefore necessarily raised by those claims: whether federal law permits unevaluated emissions projections drawn from a pending PSD application to be treated as legally operative proof that a facility's anticipated emissions are "unlawful" or will cause the harm the AG alleges—before the federal permitting process has determined whether those projected emissions are permissible at all. The AG cannot prove "unlawfulness" or a reasonable "probability of injury" in a vacuum.[9] Whether Defendants' conduct is "unlawful" necessarily depends on the approval and limitations set forth by the required permit—not on the inconsistent application of state nuisance law. Indeed, without a single system of permitting, "[i]t would be virtually impossible to predict the standard" for lawful emissions, and "[a]ny permit issued . . . would be rendered meaningless." *Ouellette*, 479 U.S. at 497 (quoting *Illinois v. City of Milwaukee*, 731 F.2d 403, 414 (7th Cir. 1984)). This is because "for an uncertain length of time after the agency issues the permit, the permit-holder would face the very real threat that the inquiry into the validity of its permit might be reopened in an altogether different forum." *Cooper*, 615 F.3d at 306 (citing *Palumbo v. Waste Techs. Indus.*, 989 F.2d 156, 162 (4th

---

[9] As noted in the AG's Motion for Preliminary Injunction [Dkt. No. 19], DEQ suspended technical review of Defendants' construction application permit; placed the application in "Pending Facility Action" status; and directed Defendants to correct or supplement the BACT analysis, emissions calculations, and air dispersion modeling. Hence, the AG is presently asking the Court to make source-specific technical determinations while that identical task is pending before DEQ. Mot. for Prelim. Inj. at 6-7, Dkt. No. 19.

Cir.1993)). The federal framework must therefore necessarily be addressed for a court to assess the AG's allegations of unlawfulness.

Further, to maintain an action for anticipatory public nuisance, the complained-of injury "must not be nominal, theoretical or speculative," *Walker*, 2016 WL 5947307, at *7, and "[a] mere fear or apprehension of injury is insufficient," *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1023 (10th Cir. 2007). The AG's own Petition reveals what evidence he relies on to meet that burden: "the project's pending air-quality permit application" shows projected emissions of "425 tons of hydrogen fluoride per year" (Pet. ¶ 19). But that application is pending before DEQ under a federal framework. The PSD process exists precisely to determine whether those projected emissions are acceptable, what BACT must be applied to reduce them, and what monitoring and conditions must be imposed before construction may even begin.[10] Until that process is complete, there is no determination that those emission levels will actually occur, are excessive, or are reasonably likely to cause injury. Yet the AG asks this Court to prohibit construction and operation of the facility "except upon such terms or conditions as are necessary to prevent the threatened public nuisance" (Pet., Prayer for Relief)—relief requiring a court to set limitations necessarily determined through the CAA's PSD permitting process.

The AG's subsequently filed Motion for Preliminary Injunction . . confirms that the PSD process enters this case through his own theory of proof. *See* Mot. for Prelim. Inj., Dkt. No. 19. There, the AG repeatedly treats the projected emissions contained in the pending PSD application

[10] Again, the AG is very much aware of the federal regulatory process. Mot. for Prelim. Inj. at 6, Dkt. No. 19 (acknowledging that DEQ "suspended its technical review, placed the application in 'Pending Facility Action' status, and directed Defendants to correct and supplement the application's core components: its best-available-control-technology analysis, its emission calculations, and its air dispersion modeling."). Yet, the AG asks the Court to ignore the federal statutory framework and instead interpose his subjective preferences for emissions.

as evidence of what the facility "will emit" and argues that the State can establish a reasonable probability of injury by taking Defendants' emissions numbers at "face value." *See* Mot. for Prelim. Inj. at 2, 15, Dkt. No. 19. The AG further relies on DEQ's ongoing technical review, asserting that DEQ's review of the emissions calculations is "competent evidence" supporting his claims. *Id.* at. 17. At the same time however, the AG asserts that DEQ has suspended review because the application's BACT analysis, emissions calculations, and air-dispersion modeling require correction and supplementation. *Id.* at 6, 17, 21. The AG thus asks this Court to treat projected emissions that remain subject to federally prescribed PSD process as legally operative proof of unlawfulness, probable injury, and likely pollution. Whether those projections may be accorded that significance arises from the AG's own proof and requested relief, not merely from an anticipated defense.

The AG's own merits presentation confirms that the permitting process is not merely regulatory background. It supplies the emissions projections and agency analysis upon which he relies to establish unlawfulness, probable injury, and likely pollution. Accordingly, the AG cannot prove that the smelter's emissions will be "unlawful" or injurious without first confronting the federal question of whether emissions that have not yet been evaluated, approved, or rejected under the CAA's permitting framework may be treated as legally operative proof of harm. The permitting process directly informs the bases of the AG's claims and is the source of the federal questions his Petition necessarily raises. Unlike *Suncor*, the federal permitting process is not merely part of the regulatory backdrop. The AG relies upon that process and the emissions projections generated by that process as the principal proof supporting his claims.[11]

[11] The *Suncor* defendants offered only policy arguments concerning claims that the "Municipalities' suit 'implicates federal issues' because it 'interfere[s] with' the federal

This action is materially different. The AG's Motion for Preliminary Injunction confirms that the distinction is substantive, not merely remedial: unlike the plaintiffs in *Suncor*, the AG affirmatively relies on a source-specific PSD application and DEQ's ongoing technical review as proof supporting the merits of his claims. The AG also affirmatively relies upon projected emissions identified in a pending permit application and asks the Court to prohibit construction unless and until conditions satisfactory to the Court are imposed.[12] To determine whether such relief may be awarded, the Court must necessarily determine:

- whether federal law permits a court to prohibit construction of a major stationary source before completion of the PSD process;
- whether emissions projected in a pending permit application may be treated as legally operative emissions limitations before DEQ completes its review;
- whether anticipated emissions may presently be deemed unlawful, unreasonable, or likely to cause pollution before BACT review, air-quality modeling, public participation and permit review have been completed; and
- whether a court may prescribe source-specific operating conditions before the federal permitting process determines those same conditions.

For those reasons, this action presents the very question expressly reserved by the Supreme Court in *AEP*: <u>Before the AG may obtain the only relief he seeks, the Court must determine whether the CAA permits a court to halt construction of a major stationary source, or prescribe source-specific operating conditions, before completion of the PSD process established by</u>

---

government's longstanding 'policy of pursuing economic growth rather than imposing emissions limits under imbalanced international agreements.'" *Suncor*, 25 F.4th at 1266.

[12] Obviously, whether injunctive relief is available at all lies, unavoidably, at the heart of the AG's position, as he does not (and cannot) request damages of any variety because no regulated emissions are even colorably occurring.

Congress. And because the "availability *vel non*" of the AG's requested relief depends upon resolution of that federal issue, this issue is necessarily raised by the Petition itself rather than merely by an anticipated defense.

Defendants do not contend for jurisdictional purposes that the future issuance of a permit is dispositive of the AG's claims. Nor is Defendants' jurisdictional theory dependent upon any eventual permit-compliance defense. Rather, Defendants contend that the Petition itself asks the Court to accord legal significance to projected emissions before the federally mandated PSD process has determined whether those projections represent permissible emissions at all. Indeed, the AG expressly argues in his Motion for Preliminary Injunction that "if construction begins this year, it begins before any permit issues," confirming that the requested injunction is directed at an unconstructed facility while the PSD process remains ongoing and incomplete. *See* Mot. for Prelim. Inj. at 22, Dkt. No. 19.

The AG relies upon those projected emissions as proof of unlawfulness. Indeed, in his Motion for Preliminary Injunction, he expressly characterizes DEQ's review of those emissions calculations as "competent evidence" supporting his claims. *See* Mot. for Prelim. Inj. at 17, Dkt. No. 19. Whether projected emissions from a pending PSD application may be treated as legally operative evidence supporting those elements therefore arises from the AG's theory of proof and requested relief, not merely from Defendants' anticipated defenses.

**2. The "actually disputed" requirement**

Notwithstanding the AG's insistence that "no federal issue is actually disputed," the evidence to the contrary is plainly set forth in his Petition: The AG seeks injunctive relief to stop the construction of the Inola smelter and to prohibit operation except upon conditions deemed necessary by the Court. Further, in his Motion for Preliminary Injunction, the AG expressly contends that the pending DEQ permit does not insulate the project from legal attack, and that a

permit is not a license to generate a nuisance. Mot. for Prelim. Inj. at 16, Dkt. No. 19. . . . That contention highlights the actual dispute here—whether such relief is consistent with the regulatory framework of the CAA. In short, it is undeniably clear from the Petition, the AG's Motion to Remand, and the AG's Motion for Preliminary Injunction that the AG asserts an entitlement to interfere with the CAA's permitting process. That alleged entitlement is directly disputed by Defendants and is not a hypothetical federal defense detached from the Petition's prayer for relief.

**3. The "substantial" requirement**

As explained by the Tenth Circuit in *Suncor*:

> The Supreme Court has applied two tests to determine whether a federal issue is sufficiently substantial. As explained in *Grable* and *Gunn*, courts should look to the importance of the issue to the federal system to determine whether it is substantial. The Supreme Court suggested in *Merrell Dow* that courts should also consider whether the relevant federal law provides a private right of action or preempts state causes of action.

*Suncor*, 25 F.4th at 1267-68 (internal citations omitted). Both tests are satisfied here.

The *Grable* substantiality standard, more specifically, is directed not to the importance of the issue to the litigants, but "instead to the importance of the issue to the federal system as a whole." *Id.* at 1268; *Grable*, 545 U.S. at 310 (holding "that the *national interest* in providing a federal forum for federal tax litigation is sufficiently substantial to support the exercise of federal-question jurisdiction.") (emphasis added). Moreover, the importance of any issue to the national interest "can be evaluated by assessing whether the federal issue 'would be controlling in numerous other cases.'" *Suncor*, 25 F.4th at 1268. Indeed, as in *Grable* (and as suggested by *AEP*), the question presented by this action could control other cases because it is purely legal: Can injunctive relief premised on state law be utilized to supersede the permitting process to be conducted by EPA under the CAA? The federal interest is not, as in *Suncor*, an abstract policy argument about energy development and foreign affairs. *See* 25 F.4th at 1268 (requiring

identification of "a concrete federal law or regulation that the case definitively implicates"). Here, the implicated federal law is the CAA itself and the specific PSD permitting requirements and standards codified at 42 U.S.C. §§ 7470–7479.

The issue is also substantial because it affects the operation of the federal system as a whole. Congress established a nationwide permitting framework governing major stationary sources precisely because emissions regulation involves technical judgment, interstate considerations, and the need for uniform administration. The AG's own Petition recognizes that emissions from the proposed smelter would not remain confined to the project site, alleging that prevailing winds would carry pollutants across Rogers County and into surrounding northeastern Oklahoma communities. (Pet., ¶ 17). Because air emissions are inherently migratory and not confined to a single parcel of land, Congress established a permitting framework designed to evaluate those impacts through nationally prescribed standards and procedures rather than through ad hoc judicial determinations. If courts may prescribe source-specific emissions conditions before completion of that process, the resulting standards would vary from court to court and jurisdiction to jurisdiction. As the Fourth Circuit warned in *Cooper*, such a result would produce a "balkanization" of emissions regulation inconsistent with Congress's chosen framework. The issue therefore extends well beyond the interests of the parties and bears directly upon the operation of the CAA's national permitting regime.

The remaining test of substantiality noted by the Tenth Circuit arises from *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804 (1986). As succinctly described in *Suncor*, that test is this: "A federal issue may also be substantial when the relevant federal law provides a private right of action <u>or preempts state remedies</u>." *Suncor*, 25 F.4th at 1269 (emphasis added). In *Suncor*, the claims involved *damages* arising from fossil-fuel sales—conduct the CAA does not regulate. *Id.*

at 1263. Here, by contrast, the AG seeks anticipatory *injunctive* relief to halt construction and impose operating conditions on a source undergoing PSD review—conduct the CAA directly and comprehensively regulates. Whether the State is entitled to injunctive relief superseding the regulatory framework delegated to EPA and DEQ is itself a substantial federal issue under *Merrell Dow*. No such issue existed in *Suncor*.

The AG repeatedly relies on 42 U.S.C. § 7416 and *Suncor's* observation that the CAA provides a regulatory "floor" rather than a ceiling. Defendants do not dispute that states may adopt more stringent emissions standards through lawful state regulatory mechanisms. Section 7416 preserves state *regulatory* authority to adopt more stringent emissions standards through the state's own administrative process—not state *judicial* authority to enjoin federally-supported projects through ad hoc common-law litigation before federal permitting is complete. That principle does not resolve the issue presented here. The question in this action is not whether Oklahoma may impose more stringent substantive standards than those required by federal law. Rather, it is whether a court, through anticipatory nuisance litigation directed at a single source, may prohibit construction or prescribe source-specific operating conditions before completion of the PSD process established by Congress. Section 7416 does not answer that question, and resolution of that question remains substantial to the operation of the federal permitting framework as a whole.

**4. The federal-state balance is not disrupted**

This case presents a narrow dispute that does not threaten any broad transfer of traditional state-law cases into federal court. Exercising jurisdiction here would not federalize ordinary nuisance litigation. Jurisdiction would extend only to the unusual case in which (1) no source has yet been constructed or is operating; (2) no permit has issued; (3) a federally mandated source-specific permitting process is presently pending; (4) the petition relies upon projected emissions drawn from that pending application; and (5) the sole requested remedy asks a court to prohibit

construction or prescribe source-specific operating conditions before the federal process has determined those same conditions**.** As the Supreme Court recognized in *Grable*, "it will be the rare state [case] that raises a contested matter of federal law," and "federal jurisdiction to resolve genuine disagreement" over such matters "will portend only a microscopic effect on the federal-state division of labor." 545 U.S. at 315. The same is true here: anticipatory nuisance suits seeking to displace a pending PSD permitting process with an injunction represent a genuinely "rare" category—not a routine state-law claim.

Important issues of federal law belong in federal courts. *See, e.g.*, *Grable*, 545 U.S. at 315; *id.* at 312 (noting that "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law"). Here, a critical issue of federal law—whether the CAA contemplates that courts can issue injunctive relief premised on state law thereby interrupting and supplanting the role of EPA and DEQ—has been squarely presented. It sensibly belongs in federal court because of the transparent need to prevent the AG from overriding the role of EPA and DEQ, as selected by Congress, through his apparent belief that only he can speak for the State of Oklahoma on emissions. Indeed, the correct balancing has already been suggested by the Supreme Court. *See AEP*, 564 U.S. at 427 ("The Clean Air Act entrusts such complex balancing to EPA in the first instance, in combination with state regulators.").

**II. The Motion to Remand Provides No Basis for Any Award of Fees and Costs.**

Defendants submit that this removal is absolutely correct for the reasons stated above, but, at a minimum, the AG's argument that Defendants lacked an "objectively reasonable basis for seeking removal under 28 U.S.C. § 1447(c)" is demonstrably wrong. The novel facts and requested remedy here supplied such a basis. Defendants identified a pending PSD process, a Petition seeking pre-permit source-specific injunctive relief, and a federal question concerning whether a court may interrupt or supplant that process before permit issuance.

The AG's *in terrorem* tactics should be rejected. As demonstrated by this briefing, it was not necessary to reference (or to distinguish) *Suncor* in Defendants' Notice of Removal. And, even if the Court ultimately rejects Defendants' jurisdictional position, removal was objectively reasonable. The Notice of Removal expressly invoked *Grable* and identified specific federal issues concerning federal air-permitting requirements, federally approved emissions standards, and the relationship between the requested injunction and the federal regulatory framework established by the CAA. The removal theory advanced by Defendants is further supported by language in *AEP*, *Ouellette*, *Cooper*, and related authorities addressing efforts to use injunctive relief to displace agency determinations regarding emissions standards and permitting.

Moreover, the factual posture of this action differs materially from *Suncor*. *Suncor* involved a claim for damages and expressly disclaimed any request to impose emissions controls or enjoin operations. Here, the AG seeks only prospective injunctive relief directed at a source undergoing active PSD review, and any such injunction would require the Court to interpret and adjudicate the sufficiency of the permitting process that must be completed by DEQ in order to satisfy the directive of the CAA. Those distinctions provide an objectively reasonable basis for asserting that *Suncor* does not resolve the jurisdictional question presented in the present case.

Even if the Court ultimately disagrees with the position taken by Defendants, their theory of removal is directly derived from language in two controlling Supreme Court decisions—*Ouellette* and *AEP*—and from the numerous other decisions cited in this briefing that have suggested that injunctive relief cannot be used to displace EPA's authority to control the reasonableness of emissions. Defendants' theory of removal further derives directly from *Grable* itself—which held that state-law claims may be removed when they "necessarily raise" a "disputed and substantial" federal issue. 545 U.S. at 314. Beyond this doctrinal foundation, the caselaw cited

herein supports the satisfaction of the *Grable* factors, providing an objectively reasonable basis for asserting that *Grable* provides federal jurisdiction in this case.

**RELIEF REQUESTED**

The AG's Motion to Remand offers only speculation concerning the basis for federal jurisdiction in this action, and the Tenth Circuit's decision in *Suncor* has not foreclosed every potential path to removal. What the AG is attempting here is unlike the existing body of CAA decisions, most of which seek to enforce permitted levels of emissions after (1) all required permits have issued, (2) construction has been completed, and (3) a source is generating regulated emissions. Instead of traveling that course, the AG seeks to stop construction indefinitely—even if approved by DEQ's permitting process—through injunctive relief that would continue "except upon such terms or conditions as are necessary to prevent the threatened public nuisance pollutants." That novel approach cannot be reconciled with the design and operation of the CAA. This case has been properly removed, and the federal statutory issue presented as a condition precedent to the AG's attempted use of state law is properly resolved by a federal court. The AG's Motion to Remand should be denied.

Respectfully submitted,

/s/ *Kayci Bair Hughes*
J. Christopher Davis, OBA #16639
Kayci Bair Hughes, OBA #18399
Bradley W. Welsh, OBA #18488
CROWE & DUNLEVY
222 N. Detroit Ave., Suite 600
Tulsa, OK 74120
Telephone: (918) 592-9800
chris.davis@crowedunlevy.com
kayci.hughes@crowedunlevy.com
brad.welsh@crowedunlevy.com

-and-

Donald K. Shandy, OBA#11511
Timila Rother, OBA #14310
CROWE & DUNLEVY
Braniff Building
324 N. Robinson Ave., Suite 100
Oklahoma City, OK 73102
Telephone: (405) 235-7700
don.shandy@crowedunlevy.com
timila.rother@crowedunlevy.com

**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

On the 13th day of August, 2026, Notice of the foregoing filing through the Court's electronic filing system was provided to the following counsel of record:

Gentner Drummond
Garry M. Gaskins, II
Jennifer L. Lewis

/s/ *Kayci Bair Hughes*
Kayci Bair Hughes