**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

STATE OF OKLAHOMA, ex rel. GENTNER DRUMMOND, in his official capacity as ATTORNEY GENERAL OF OKLAHOMA,

Plaintiffs,

v.

CENTURY ALUMINUM COMPANY, a Delaware corporation; and ALUMINUM OKLAHOMA, LLC d/b/a OKLAHOMA PRIMARY ALUMINUM, LLC,

Defendants.

**Case No. 26-cv-00450-SH**

**STATEMENT OF INTEREST OF THE UNITED STATES**

**TABLE OF CONTENTS**


INTEREST OF THE UNITED STATES ....................1

BACKGROUND ....................4

ARGUMENT ....................7

I. THE COURT SHOULD DISMISS THE PETITION WITHOUT PREJUDICE BASED ON THE ENVIRONMENTAL PERMITTING PROCEEDINGS FOR THE FACILITY AT ISSUE IN THIS CASE ....................7

A. Primary Jurisdiction is Appriate Because the Permitting Proceedings May Impact the Merits of the Plaintiff's Claims. ....................8

1. Whether DEQ issues a PSD permit influences this Court's analysis of whether Plaintiff's nuisance claim is viable. ....................8
2. Whether DEQ issues an NPDES permit influences this Court's analysis of whether Plaintiff's pollution claim is viable. ....................10

B. Primary Jurisdiction is Appropriate Because the Facility Could Be Subject to Different or Conflicting Orders. ....................11

C. Primary Jurisdiction is Appropriate Because the Factual Issues Are Outside the Conventional Experience of the Court. ....................12

D. The Court Should Dismiss Plaintiff's Claims Or, In the Alternative, Stay Proceedings. ....................13

II. IN ALL EVENTS, THE COURT SHOULD DENY PLAINTIFF'S MOTION FOR PRELIMINARY INJUCTION ....................14

A. Plaintiff Has Not Shown That It is Likely to Suffer an Imminent Irreparable Injury. ....................14

B. The Balance of Equites Weighs in Defendants' Favor. ....................15

C. The Injunction Conflicts with the Public Interest. ....................16

CONCLUSION ....................16

Pursuant to 28 U.S.C. § 517, the United States submits this statement of interest requesting this Court dismiss Plaintiff's petition based on primary jurisdiction and deny Plaintiff's motion for a preliminary injunction as moot. Defendants Century Aluminum and Aluminum Oklahoma, LLC's primary aluminum smelter project has a direct impact on the United States' economic and national security. Because the outcome of Defendants' pending federal Clean Air Act, 42 U.S.C. §§ 7401 *et seq*. ("CAA"), permit application may affect the Court's decision on Plaintiff's claims, the Court should dismiss Plaintiff's petition. Alternatively, the Court should stay proceedings until a decision is issued on the permit. In all events, the Court should deny the motion for a preliminary injunction.

**INTEREST OF THE UNITED STATES**

The United States supports the construction and operation of Defendants' primary aluminum smelter project, because it promotes national security. The relief sought in Plaintiff's petition attempts to block the project and thus risks undermining national security. The petition also implicates the comprehensive federal regulatory program that specifically addresses the potential environmental impacts of the smelter project. Plaintiff's claims interfere with the application of the CAA by seeking injunctive relief barring the construction and operation of the project, arguing environmental injuries. But the CAA specifically assesses the environmental impact of Defendants' air emissions.

The United States has a substantial interest in this case to ensure national security and economic independence from foreign nations. *See* Michael Cadenazzi Decl. The President issued Proclamation 9704 on March 8, 2018, *Adjusting Imports of Aluminum Into the United States*, recognizing that the aluminum imported into the United States has created circumstances impairing national security. 83 Fed. Reg. 11619 (Mar. 8, 2018). In further response to this

national security risk, the President issued Proclamation 11045 on July 20, 2026, *Further Strengthening Actions Taken to Adjust Imports of Aluminum Into the United States* to create incentives for new investment in United States' production facilities to produce primary aluminum. 91 Fed. Reg. 46635 (July 20, 2026). Additionally, Defendants' project is supported under Executive Order 14241, *Immediate Measures to Increase American Mineral Production* (Mar. 20, 2025), marshalling federal resources to secure predictable and affordable supply materials for our national and economic security.

The United States thus supports the project, which, when finished, will be the first domestic primary aluminum smelter in over four decades in Inola, Oklahoma. Cadenazzi Decl. ¶ 15. The smelter addresses critical manufacturing vulnerabilities in the United States, secures national technological sovereignty, and rebuilds our domestic industrial base. *Id.* ¶¶ 8–14. In fact, primary aluminum is required for hundreds of critical defense systems and is a foundational pillar to domestic infrastructure. *Id.* ¶ 7. Unfortunately, China remains the leading producer of primary aluminum, accounting for 59 percent of the global production, and thus, the Oklahoma smelter project is a cornerstone of the United States Department of War ("DOW")[1] strategy in securing domestic primary aluminum. *Id.* ¶¶ 11, 17. Once completed, the smelter will rank as the largest primary aluminum production facility in the United States, more than doubling our nation's total output. *Id.* ¶ 16. The smelter would be the only smelter capable of meeting the nation's urgent need for a domestic source of primary aluminum, estimating to produce tens of thousands of tons of critically important aluminum per year and significantly reducing our reliance on foreign primary aluminum. *Id.* ¶ 9. The United States has worked with Oklahoma and

[1] The Department of War as used in this brief means the Department of Defense as defined in 10 U.S.C. § 111.

Defendants to ensure compliance with federal laws, including the CAA. The DOW and the United States Department of Energy ("DOE") have also had active engagement in this project to achieve national security and economic independence.

DOW encouraged the development of the smelter that will produce militarily strategic aluminum, consistent with the directive in Executive Order 14241 and DOW's statutory authorities. DOW publicly offered support, explaining that high purity aluminum is fundamental to United States' defense system and partnered with DOE to ensure the success of this project. Ex. 1.

DOE through its Industrial Demonstrations Program and its authority under the Infrastructure Investment and Jobs Act, Pub. L. No. 117–58, § 41008, 135 Stat. 429, 1001 (2021), and the Inflation Reduction Act of 2022, 42 U.S.C. § 17113b, awarded Century Aluminum $500 million in support of this project. Scott Milliren Decl. ¶¶ 6–8. The purpose of the Industrial Demonstrations Program is to reinvigorate the manufacturing sector while producing low- and net-zero emissions.[2] *Id.* DOE selected the project because the smelter would double the size of the current primary aluminum industry while avoiding an estimated 75 percent of emissions from a traditional smelter. *Id.* ¶ 8, 11. Because of the project's direct impact to the nation's economic and national security, the United States has a substantial interest in this litigation.

**BACKGROUND**

The United States Environmental Protection Agency ("EPA") ensures Defendants' compliance with federal environmental laws, including the CAA. Defendants must apply for and

[2] U.S. Department of Energy, Award Wednesday (January 15, 2025), https://www.energy.gov/cmei/oced/articles/award-wednesday-january-15-2025 [https://perma.cc/F9F4-UFMC].

secure both a Prevention of Significant Deterioration ("PSD") permit and a Title V operating permit under the CAA. The purpose of the CAA is "to protect and enhance the quality of the [n]ation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. §7401. Additionally, wastewater discharges to navigable waters are regulated under the National Pollutant Discharge Elimination System ("NPDES") under the Clean Water Act ("CWA") section 402, 33 U.S.C. § 1342. The CAA and CWA are relevant here because they directly address the air emissions and wastewater discharges of other pollutants into the environment that Plaintiff alleges will cause environmental injury.

Defendants have applied for a PSD permit from the Oklahoma Department of Environmental Quality ("DEQ"). EPA approved the DEQ state implementation plan related to PSD permits. To receive a PSD permit, Oklahoma's DEQ will make a Best Available Control Technology determination, assess the proposed source's air quality impacts and provide an analysis of the projected impairment to visibility, soils, and vegetation as a result of the construction of the proposed source. Okla. Admin. Code §§ 252:100-8-34, 252:100-8-35, 252:100-8-35.2. Although hazardous air pollutants are not subject to PSD review, 42 U.S.C. § 7412(b)(6), DEQ's regulations provide that, if the proposed source is a major source of hazardous air pollutants, the agency must make a Maximum Achievable Control Technology determination before Defendants begin actual construction. Okla. Admin. Code § 252:100-8-4. DEQ's draft permit must undergo public notice and comment before it may be finalized, during which time EPA may also review the permit for compliance with CAA requirements. Okla. Admin. Code § 252:4-7-13.

Defendants will also have to apply for a Title V permit within 180 days after commencing operation, which similarly requires public comment and EPA review. Okla. Admin.

Code §§ 252:100-8-4(b)(3), 252:4-7-13. Title V permits require enforceable emission limits and standards, a compliance schedule, monitoring, and such other conditions as are necessary to assure compliance with applicable requirements. 42 U.S.C. § 7661c. If a party is dissatisfied with a Title V permit issued by a State, it can petition EPA to object to the permit, *see* 42 U.S.C. §§ 7661d(b)(1); (b)(2); (c), and if EPA declines to object, EPA's denial is subject to judicial review exclusively in the United States courts of appeals. *Id.* § 7607(b)(1). Consequently, it is the responsibility of DEQ and the EPA to assess the impact of air pollution in the first instance, not Plaintiff, Oklahoma's Attorney General.

Additionally, hydrogen fluoride ("HF") is a hazardous air pollutant under the CAA. 42 U.S.C. § 7412(b). EPA has promulgated National Emission Standards for Hazardous Air Pollutants for Primary Aluminum Reduction Plants, which contain Maximum Achievable Control Technology emission limits for "total fluorides" as a surrogate for HF. 40 C.F.R. pt. 63, subpt. LL. If the proposed facility is subject to these standards, it will be required to meet the specific limits set out in these regulations, which will become required components of its Title V permit. *See id.*; *id.* §§ 70.6(a)(1) (requiring that each Title V permit include requirements that "assure compliance with all applicable requirements"), 70.2 (defining "applicable requirement" to include "[a]ny standard or other requirement under section 112 of the Act").

Finally, the project may involve a NPDES permit under the CWA for wastewater discharges associated with the facility's operations. *See* Pet. ¶¶ 32, 41 (making allegations about wastewater). DEQ is authorized to implement the NPDES permit program under CWA section 402. 33 U.S.C. § 1342; Okla. Stat. tit. 27A, § 2-6-204. Defendants must secure a NPDES permit for discharge of a pollutant from each point source, which under state law means "any and all points of origin of any wastes, pollutants or contaminants whether publicly or privately owned or

operated." Okla. Stat. tit. 27A, §§ 1-1-201, 2-6-205. Oklahoma law also requires a NPDES permit prior to construction for associated stormwater discharges. Okla. Admin. Code § 252:611-9-2. DEQ reviews the NPDES permits and may set conditions, plans, limitations, and other requirements before issuing the permit. Okla. Admin. Code § 252:606-3-3. EPA also reviews the permit application and has the opportunity to object. 33 U.S.C. § 1342(d).

Defendants are actively pursuing permitting under the CAA and could pursue additional permits to construct and operate the facility, and these permits may influence the outcome of Plaintiff's claims. Because of the project's importance to national and economic security and the permit's impact on the litigation, the Court should dismiss the petition, or in the alternative stay the case on the basis of primary jurisdiction. In any event, the Court should deny the motion for a preliminary injunction.

## ARGUMENT

Plaintiff's petition and motion for preliminary injunction are premature because the permitting related to the aluminum smelter project may bear on the merits of Plaintiff's claims. This Court should dismiss the petition without prejudice based on primary jurisdiction. Alternatively, the Court should stay the litigation until after DEQ has made a decision on Defendants' pending permit application. In any event, the Court should deny the motion for a preliminary injunction.

### I. THE COURT SHOULD DISMISS THE PETITION WITHOUT PREJUDICE BASED ON THE ENVIRONMENTAL PERMITTING PROCEEDINGS FOR THE FACILITY AT ISSUE IN THIS CASE.

The Court should dismiss Plaintiff's petition on the basis of primary jurisdiction because (1) DEQ's permitting process may influence the outcome of this litigation; (2) the permit may

conflict with the Court's order; (3) the Court would benefit from agency expertise; and (4) Plaintiff will not be prejudiced by the dismissal without prejudice.

Under the doctrine of primary jurisdiction, this Court has discretion to refer the issues in this case to an administrative agency. *TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1238 (10th Cir. 2007). The purpose of primary jurisdiction is to "allow agencies to render opinions on issues underlying and related to the cause of action." *Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 415 F.3d 1171, 1179 (10th Cir. 2005). It is "designed to allow an agency to pass on issues within its particular area of expertise before returning jurisdiction to federal district court for final resolution of the case." *Id.* at 1176. The doctrine is "specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993).

To invoke the primary jurisdiction doctrine, the court will assess whether the factual issues in this case (1) fall outside the conventional experience of judges; (2) require the exercise of administrative discretion; or (3) require uniformity and consistency in the regulation of the business entrusted to the particular agency. *Crystal Clear Commc'ns*, 415 F.3d at 1179. Additionally, the doctrine may be appropriate "when the regulatory agency has actions pending before it which may influence the instant litigation." *TON Servs., Inc.*, 493 F.3d at 1239. The primary purpose of the doctrine is to use administrative expertise and promote uniformity between the agency action and court orders. *Id.*

### A. Primary Jurisdiction is Appropriate Because the Permitting Proceedings May Impact the Merits of the Plaintiff's Claims.

The Court has discretion to invoke primary jurisdiction when agency action may influence the litigation. *Id*. Plaintiff has brought two state law claims against Defendants: an anticipatory public nuisance claim and a pollution claim. Pet. ¶¶ 34–42. As Plaintiff recognized

in his petition, Defendants' air-quality permit application is *pending*. *Id.* ¶ 19. In fact, construction has not started, and the alleged harm is not immediate. *Id.* ¶ 31. Although no injury has occurred, Plaintiff still seeks preliminary injunctive relief prohibiting Defendants from constructing or operating an aluminum smelter, and abatement of the alleged public nuisance. The viability of both claims will be affected by the permitting processes. The Court would thus benefit from invoking primary jurisdiction to properly assess the merits of Plaintiff's claims.

***1. Whether DEQ issues a PSD permit influences this Court's analysis of whether Plaintiff's nuisance claim is viable.***

If DEQ issues a PSD (and Title V) permit to Defendants, their actions in compliance with permit terms will be lawful under the CAA. Nuisance under Oklahoma law requires an *unlawful* act or omission. Okla. Stat. tit. 50, § 1. Public nuisance liability is limited to "(1) committing crimes constituting a nuisance, or (2) causing physical injury to property or participating in an offensive activity that rendered the property uninhabitable." *State ex rel. Att'y Gen. of Okla. v. Johnson & Johnson*, 2021 OK 54, ¶ 18, 499 P.3d 719, 724.

If Defendants receive a permit, plant emissions in compliance with the permit terms and limits will not be unlawful under the CAA. Oklahoma courts have consistently held that an act must be unlawful to establish a nuisance. *Nuncio v. Rock Knoll Townhome Vill., Inc.*, 2016 OK Civ. App. 83, ¶ 8, 389 P.3d 370, 374 (smoking in the private home was not unlawful under the statute that prohibited smoking in indoor public spaces). In fact, Oklahoma courts recognize that "[s]tatutorily authorized acts are immune from suit for public nuisance." *Oklahoma ex rel. Drummond v. Tyson Foods, Inc.*, 653 F. Supp. 3d 937, 1050 (N.D. Okla. 2023); *E.I. Du Pont de Nemours Powder Co. v. Dodson*, 1915 OK 256, ¶ 7, 49 Okla. 58, 150 P. 1085, 1087 ("It seems to be well settled that, where one has the sanction of the state for what he does, unless he commits a fault in the manner of doing it, he is completely justified, provided the Legislature has the

constitutional power to act."). For example, in *City of Bartlesville v. Ambler*, the Oklahoma Supreme Court held that because construction of a drainage ditch was authorized by the city council, the construction could not be a nuisance. 1971 OK 154, ¶ 10, 499 P.2d 433, 435. Although courts have held that certain acts may constitute a nuisance when the act extends outside the authority of the government license or permit, primary jurisdiction is still warranted here. *Briscoe v. Harper Oil Co.*, 1985 OK 43, ¶ 10, 702 P.2d 33, 36 ("[C]ertain act cannot protect the licensee who abuses the privilege" of the license). Indeed, Plaintiff does not allege that Defendants will violate the terms of a forthcoming permit. This Court would thus benefit from the proper assessment of whether Defendants' actions fall within the statutorily authorized permit or broach into nuisance, which it cannot assess without the issued permit.

***2. Whether DEQ issues an NPDES permit influences this Court's analysis of whether Plaintiff's pollution claim is viable.***

Defendants' pending PSD permit application is the most obvious justification for a primary-jurisdiction dismissal. But future permitting requests could also bear on the Court's decision. For example, the petition alleges that the project will route wastewater through a facility that's not permitted for such waste. *See* Pet. ¶ 41. But Defendants may ultimately apply for such a permit. If the smelter's operation results in wastewater discharges regulated under the CWA, for example, Defendants could apply for an NPDES permit that allows such discharges. Under Oklahoma law, it is "unlawful for any person to cause pollution of any water . . . or cause to be placed any wastes in a location where they are likely to cause pollution of any air, land or waters of the state."[3] Okla. Stat. tit. 27A, § 2-6-105. Pollution is defined as any substance,

[3] Courts have consistently described the statute as a water pollution statute and declined to apply it to injuries outside the purpose of the statute. *Chartney v. City of Choctaw*, 2019 OK Civ. App. 26, ¶ 10, 441 P.3d 173, 177 (plaintiff failed to demonstrate the statute intended to prevent the type of injury they suffered).

contaminant, or pollutant "which are or will likely create a nuisance or which render or will likely render the environment harmful or detrimental or injurious to public health." Okla. Stat. tit. 27A, § 2-1-102(12).

If that permit application were granted, it would doom Plaintiff's pollution claim. Oklahoma law specifies that "unlawful discharge" is "discharge [of] any pollutant into waters of the state or elsewhere without first obtaining a permit." Okla. Stat. tit. 27A, § 2-6-205. Additionally, the law specifically provides that if the discharge complies with Oklahoma Water Quality Standards set by DEQ, the discharge "shall not be deemed to be pollution." Okla. Stat. tit. 27A, § 2-6-103.2(C)(3).

Without the results of the permitting process, it is unclear whether Defendants' wastewater discharges would constitute pollution. *Lazy S Ranch Props., LLC v. Valero Terminaling & Distrib. Co.*, 92 F.4th 1189, 1196 (10th Cir. 2024) (pollution requires that the released substance will likely create a nuisance). As discussed above, the Court must also assess the permits to properly determine if Plaintiff's claim is a nuisance. *Supra* I.A.1. For example, if Defendants obtain an NPDES permit from DEQ, the discharge will not be unlawful under Oklahoma law. Defendants have not even been granted the opportunity to apply for an NPDES permit for its operations, if required, before Plaintiff filed this suit.

Because the CAA and CWA permitting processes will impact the Court's decision on Plaintiff's claims, primary jurisdiction is appropriate. *TON Servs., Inc.*, 493 F.3d at 1240 (primary jurisdiction is appropriate because the FCC's orders are central to defining the obligations under the Communication Act); *see also Loggerhead Turtle v. Cnty. Council of Volusia County*, 148 F.3d 1231, 1260 (11th Cir. 1998) ("Invoking the primary jurisdiction doctrine would avoid a judicial solution that might conflict with the regulatory scheme already

approved by the appropriate administrative agency."); *CF Indus., Inc. v. Transcon. Gas Pipe Line Corp.*, 614 F.2d 33, 35 (4th Cir. 1980) ("[T]he advisability of invoking primary jurisdiction is greatest when the issue is already before the agency"). The Court should decline Plaintiff's attempt to bypass the relevance of the federal permitting process in deciding their claims on the merits.

### B. Primary Jurisdiction is Appropriate Because the Facility Could Be Subject to Different or Conflicting Orders.

The Court should invoke primary jurisdiction because Defendants could be subject to different or conflicting orders. DEQ and EPA may assess the environmental factors and determine that Defendants have complied with the standards of the CAA or the CWA. However, if the Court grants Plaintiff's prohibitory injunctive relief, the relief may conflict directly with DEQ's permit. The doctrine of primary jurisdiction "ensure[s] desirable uniformity in determinations of certain administrative questions." *Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1496 (10th Cir. 1996). For example, in *Sierra Club v. Chesapeake Operating, LLC*, where plaintiffs sought a substantial reduction of the volumes of wastewater, the court recognized that if it granted plaintiffs relief it would impose stricter standards and directly conflict with the agency order related to a certain reduction level. 248 F. Supp. 3d 1194, 1207–08 (W.D. Okla. 2017). The court held that primary jurisdiction was appropriate to promote uniformity. The same applies here. This Court should promote uniformity through primary jurisdiction.

### C. Primary Jurisdiction is Appropriate Because the Factual Issues Are Outside the Conventional Experience of the Court.

The Court's consideration of the issues in this case would no doubt benefit from DEQ and EPA exercising their technical expertise on air emissions under the CAA and the proposed

source's impact on the environment. The complex technical and scientific factual issues bound up in deciding whether emissions of air pollutants under the CAA result in environmental harm fall outside the conventional experience of the Court and would benefit from the expert agencies' views. This is not to say that the Court is incapable of resolving such issues; rather, the Court's decision-making process would be better served with the benefit of the expert agencies' views than without them.

DEQ and the EPA have expertise in analyzing and determining the appropriate emission level, and that question is outside the scope of a judge's conventional experience. The Court would benefit from the permit review that will assess emissions under the CAA thoroughly before making a decision on Plaintiff's claims. *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 751 (10th Cir. 2005) (primary jurisdiction is appropriate when a decision "require[s] the court to confront issues of fact outside of its conventional experience"); *Marshall v. El Paso Nat. Gas Co.*, 874 F.2d 1373, 1377 (10th Cir. 1989) (same). The same goes for any future CWA permitting decision.

### D. The Court Should Dismiss Plaintiff's Claims Or, In the Alternative, Stay Proceedings.

Dismissal is appropriate because Plaintiff will not be prejudiced or "unfairly disadvantaged." *Reiter*, 507 U.S. at 268–69. Because Plaintiff seeks injunctive relief, dismissal, not a stay, is most appropriate. *Far East Conf. v. United States*, 342 U.S. 570, 577 (1952). A stay is appropriate when "damages are sought and the relevant statute of limitations might preclude relief." *TON Servs., Inc.*, 493 F.3d at 1243. Here, Plaintiff seeks injunctive relief, not damages. A statute of limitations is also not at play because no injury has occurred. Okla. Stat. tit. 12, § 95 (requiring trespass upon real property, injury to personal property, or injury to the rights of another, not arising from contract, for accrual). Dismissing the case will not prejudice Plaintiff.

Defendants have not begun construction, nor can they until DEQ grants the PSD permit. Plaintiff may file a new claim after DEQ makes its permitting decision, which may be unnecessary if Plaintiff ultimately agrees with the permitting decision. Thus, dismissal is appropriate. *Sierra Club*, 248 F. Supp. 3d at 1208 ("[P]rimary jurisdiction is more readily applicable if injunctive relief, requiring scientific or technical expertise, is requested."). If the Court dismisses the petition, it could then deny the motion for a preliminary injunction as moot.

In the alternative, the Court should stay the proceedings until the DEQ has, at a minimum, addressed the pending permit application. Although dismissal is appropriate, the courts also have discretion to stay proceedings under primary jurisdiction. *TON Servs., Inc.*, 493 F.3d at 1243; *Crystal Clear Commc'ns*, 415 F.3d at 1178 n.6; *Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1040 (10th Cir. 1993). Because primary jurisdiction is warranted based on the pending permitting issues, the Court should stay the case if it does not dismiss without prejudice.

## II. IN ALL EVENTS, THE COURT SHOULD DENY PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION.

If the Court does not dismiss the complaint, the Court should deny Plaintiff's motion for preliminary injunction because (1) Plaintiff has not shown that it is likely to suffer imminent irreparable harm; (2) the balance of the equities cut against Plaintiff; and (3) an injunction would conflict with the public interest.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest."[4] *Id.* at 20. "Under *Winter*'s rationale, any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016).

**A. Plaintiff Has Not Shown That It is Likely to Suffer an Imminent Irreparable Injury.**

Plaintiff has not shown that it is likely to suffer imminent irreparable harm without a preliminary injunction. In fact, Plaintiff's motion and petition are premature. As Plaintiff has recognized, no construction has occurred. Pl.'s Mot. Prelim. Inj. 21. In fact, Defendants cannot begin construction until DEQ issues a PSD permit. *Id.* Plaintiff's reliance on the moratorium expiration is unavailing. *Id.* The expiration of the Town of Inola's moratorium on new construction does not automatically allow construction because Defendants must still secure a PSD permit. *Id.*

"The party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (emphasis in original). As Plaintiff recognized, the PSD permit is a precondition before construction, and thus, no harm will occur until after the permit. *Id.* Plaintiff's "vague assurances" that construction could occur this year are not sufficient. *Colorado v. EPA*, 989 F.3d 874, 886–87 (10th Cir. 2021) (holding that declaration that the action "could" begin as soon as the rule goes into effect was not sufficient to establish irreparable harm). Assuming that the permit is approved, construction itself does not result in the harm Plaintiff alleges. *Cf., e.g.*, *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250 (10th Cir. 2003) (irreparable harm found when there was danger of actual death of eagles

---

[4] For the reasons discussed above, Plaintiff is unlikely to succeed on the merits.

and destruction of their breeding grounds if developer were allowed to proceed). Plaintiff's alleged injury is caused by *emissions* and *wastewater discharges* into the environment, neither of which will occur until after the smelter is in operation. Construction itself is not the injury at issue, and there is ample time to renew a motion should the alleged harm become imminent.

### B. The Balance of Equities Weighs in Defendants' Favor.

Enjoining construction would significantly harm Defendants. The economic cost of stopping construction and the delay in project completion cannot be overlooked. *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 768 (10th Cir. 2014) (holding that the economic cost of stopping construction and delaying completion of construction outweighs any injury to plaintiff). Defendants and the federal government have invested significantly in this project. *Valley Cmty. Pres. Comm'n v. Mineta,* 373 F.3d 1078, 1086 (10th Cir. 2004) (recognizing that enjoining a project with investment cost is a significant financial harm). Unlike Plaintiff who will suffer no irreparable injury prior to or during construction, Defendants will face financial burden and delay in the project. Thus, the balance of equities weighs in Defendants' favor.

### C. The Injunction Conflicts with the Public Interest.

Enjoining the aluminum smelter project will directly conflict with the public's interest. This project promotes the public interest because it will promote U.S. economic and national security. Cadenazzi Decl. ¶¶ 15–19. The United States has critical vulnerability in the manufacturing of primary aluminum. *Id.* ¶¶ 8–14. Once completed, the smelter will more than double the United States' output of primary aluminum, ensuring the United States has access to important materials used for the national defense to promote national security. *Id.* ¶¶ 15–19. The Supreme Court has held that the public has an interest in national security and military readiness. *Winter*, 555 U.S. at 26; *see also Stagg P.C. v. U.S. Dep't of State*, 673 F. App'x 93, 96 (2d Cir.

2016) (national security is in the public interest); *D.B.U. v. Trump*, 781 F. Supp. 3d 1158, 1174 (D. Colo. 2025) (same); *Oklahoma v. Biden*, 577 F. Supp. 3d 1245, 1265 (W.D. Okla. 2021) (same); *Church v. Biden,* 573 F. Supp. 3d 118, 146 (D.D.C. 2021) (same). The Court should not enjoin the aluminum smelter project; doing so would negatively affect national security. As we explained above, the project is a cornerstone of DOW's strategy for how to secure domestic primary aluminum.

## CONCLUSION

The United States provided financial support for this project, and an injunction blocking the project would impair national security. Additionally, the state law anticipatory nuisance and pollution claim have a close nexus to the outcome of the federal CAA permitting proceedings and, potentially, later CWA permits related to wastewater discharge. If the permits are issued, the outcome of the permitting proceedings may provide a defense to Plaintiff's claims. For these reasons the Court should either dismiss this case without prejudice or stay all proceedings in this case until after the CAA permitting proceedings have been completed. In any event, the Court should deny the motion for a preliminary injunction.

Dated: August 27, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resource Division

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

*/s/ Susan R. Davis*
SUSAN R. DAVIS
United States Department of Justice
Environment and Natural Resources Division

Environment Defense Section
999 18th Street
North Terrace, Suite 600
Denver, CO 80202
Phone: (202) 598-6399
Email: susan.davis@usdoj.gov

***Counsel for the United States of America***

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2026, I filed the foregoing STATEMENT OF INTEREST OF THE UNITED STATES with the Court's CM/ECF system, which will electronically serve all counsel of record.

*/s/Susan R. Davis*
Susan R. Davis